NORMAN TITCHER AND MARJORIE TITCHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF HARRIS B. GOLDBERG, DECEASED, WENDY GOLDBERG, ADMINISTRATRIX, AND WENDY GOLDBERG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2519–69, 2751–69. Filed December 8, 1971.

*Willard C. Williams*, for the petitioners.
*H. Lloyd Nearing*, for the respondent.

### OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in petitioners' income tax as follows:

| Petitioner | Year | Deficiency |
| --- | --- | --- |
| Norman and Marjorie Titcher | 1964 | $17,032.68 |
| Estate of Harris B. Goldberg, Deceased, Wendy Goldberg, Administratrix, and Wendy Goldberg | 1964 | 34,945.30 |

The sole remaining issue is whether $100,000 paid by a subchapter S corporation pursuant to a land sale contract was deductible as "interest" under section 163, I.R.C. 1954. The facts have been stipulated.

Norman and Marjorie Titcher, petitioners in docket No. 2519-69, are husband and wife. They filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue at Los Angeles, Calif., and resided in Encino, Calif., at the time of the filing of their petition herein.

Petitioners in docket No. 2751-69 are the Estate of Harris B. Goldberg and Wendy Goldberg, Harris's wife. Harris B. and Wendy Goldberg filed a joint Federal income tax return for the calendar year 1964 also with the district director of internal revenue at Los Angeles, Calif. Harris B. Goldberg died on November 23, 1965, and Wendy is the administratrix of his estate. She resided in London, England, at the time her petition was filed herein.

On December 1, 1964, Harris B. Goldberg (Goldberg) entered into an "Agreement of Sale" with the Devereux Foundation (Devereux or the foundation), in which he contracted to purchase certain land in Santa Barbara, Calif., referred to as parcel No. 1, consisting of approximately 215 acres. In the same agreement, certain provisions were also made with respect to a second tract referred to as parcel No. 2, consisting of approximately 32 acres. The "Agreement of Sale" provided in part as follows:

The sale of the above premises shall be upon the following terms and conditions, to wit:

1. The consideration for Parcel No. 1 shall be at the rate of TWENTY FIVE THOUSAND DOLLARS ($25,000.00) per acre, which shall include ONE HUNDRED THOUSAND DOLLARS ($100,000.00) prepaid interest, which shall be paid to the Seller by the Buyer in the following manner: (The said consideration shall be adjusted in accordance with the certified acreage herein provided).

ONE-HUNDRED THOUSAND DOLLARS ($100,000.00) in each ['cash?] upon the execution of this Agreement, and the balance in cash at the close of escrow, i.e. the date of recordation of the Deed and delivery of the consideration and the delivery of the Policy of Title Insurance.

As to Parcel No. 2, the price shall be TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) per acre, which shall be paid to the Seller by the Buyer in the following manner:

TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00) in each [cash?] upon the execution of this Agreement, and the balance in cash at the close of escrow, i.e. the date of recordation of the Deed and delivery of the consideration and the delivery of the Policy of Title Insurance.

2. Parcels Nos. 1 and 2 are to be conveyed in accordance with a preliminary Title Report issued by Title Insurance and Trust Company dated November 18, 1964, and bearing Order No. 105147-LP, and title insurance shall be in accordance therewith, with the exceptions noted thereon, except for items 3 and 4, which shall be the responsibility of the Seller to have removed prior to closing.

3. Closing hereunder as to Parcel No. 1 shall be completed September 30, 1965. Closing as to Parcel No. 2, subject to the conditions hereinafter set forth, shall take place not later than September 30, 1970.

\*     \*     \*     \*     \*     \*     \*

[Several provisions of the "Agreement of Sale" were in respect of the continued use of parcel No. 2 by the Devereux Foundation prior to the closing of the sale of such parcel and after the completion of the sale of parcel No. 1. By one such provision the foundation retained an easement over parcel No. 1 as a means of access to parcel No. 2.]

17. If for any reason the title shall not be in accordance with paragraph 2 hereof, Buyer shall have the option, in lieu of all other remedies, of taking such title as the Seller can give without abatement of price, or of being repaid all monies paid on account by Buyer to Seller.

---

Seller should offer said Parcel No. 2 to Buyer and Buyer agrees to purchase the same at a price of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) per acre. Buyer shall have 120 days from the date of notice within which to complete closing.

19. Upon the expiration of five years [1] from the date of closing, of Parcel No. 1, and in the event that all or any part of the property shall be offered for sale or lease by Seller, the parties shall endeavor to agree upon the purchase price before it is offered by Seller to any other party. If no agreement can be reached with respect to the price, Seller shall deliver to Buyer a form of Agreement of Sale to purchase the property offered for sale at a price and upon terms which are acceptable to Seller and which have been received from any other bona fide purchaser, and Buyer shall have 60 days from and after the receipt of said Agreement to accept or reject the same, and another 90 days after acceptance to deposit funds or to close.

\*     \*     \*     \*     \*     \*     \*

23. Wherever the word "Buyer" is used herein, it is understood to mean the Buyer and his nominee and successive nominee which may be appointed hereunder.

24. This Agreement is conditioned upon receiving the approval of the Board of Trustees of the Devereux Foundation, and shall not be binding upon said Foundation until a Resolution is properly passed by the Board of Trustees approving the terms hereof. If said approval is not received on or before December 12, 1964, this Agreement shall be deemed to be cancelled and of no effect.

Under the terms of the "Agreement of Sale" the purchase price for parcel No. 1 was to be paid at the time of the closing of the escrow of the property, which was to occur by September 30, 1965.

Also on December 1, 1964, and pursuant to paragraph 23 of the "Agreement of Sale," Goldberg assigned all of his rights under the agreement to Boniday, Inc. ("Boniday" or the "corporation"), and nominated Boniday as the buyer of parcels Nos. 1 and 2 in lieu of himself. Boniday was a California corporation, organized under the laws of

---

[1] Although these provisions refer to a date 5 years after the closing in respect of parcel No. 1, the escrow instructions in respect of parcel No. 2 (*infra* p. 319) contemplate a closing for parcel No. 2 on or before the expiration of 25 years.

that State on December 11, 1964.[2] At all relevant times Goldberg or his estate was the owner of 50 percent of the capital stock of Boniday. Petitioners Norman and Marjorie Titcher at all relevant times were the owners of the remaining 50 percent of the capital stock of the corporation.

On the same date as the "Agreement of Sale" and Golberg's assignment of his interests therein to Boniday—December 1, 1964—separate escrow instructions pertaining to parcels Nos. 1 and 2 were executed by Boniday and the Devereux Foundation. The escrow instructions for parcel No. 1 provided as follows:

On or before September 30, 1965, I will hand you five million two hundred ninety thousand and twenty five dollars ($5,290,025.00) and hand you herewith the sum of $100.00 which you will deliver when you obtain Grant Deed and when you can issue your usual form of CLTA Standard policy of title insurance with liability not exceeding $5,290,125.00 on 248.037 [sic] acres of land being a portion of the land described in your preliminary report * * * showing title vested in BONIDAY, INC., a California corporation or nominee SUBJECT ONLY TO. (1) * * *

*    *    *    *    *    *    *

The sum of $100,000.00 has heretofore been paid to the sellers, which sum represents prepaid interest on the promissory note hereinafter referred to, and the sum of $100.00 deposited herewith shall be paid to sellers without further instructions if this escrow is not closed on or before September 30, 1965 and the prepaid interest and said deposits of $100.00 shall be considered liquidated damages and Harris Goldberg shall have no further liability herein.

The purchaser herewith deposits an unsecured promissory note payable to the seller in the sum of $5,290,125.00 due on or before September 30, 1965 with interest at 2.26837 percent per annum, payable in advance. Said note to be held in the within escrow and cancelled on September 30, 1965 or on the date of closing the escrow, which ever is sooner.

*    *    *    *    *    *    *

If for any reason the title shall not be in accordance with the within instructions, Buyer shall have the option, in lieu of all other remedies, of taking such title as the Seller can give without abatement of price, or of being repaid all monies paid on account by Buyer to Seller.

The escrow instructions stated that Boniday deposited the amount of $100 with the escrow agent at the time such instructions were executed.

In addition Boniday executed and deposited with the escrow agent on December 1, 1964, an unsecured promissory note payable to the order of Devereux on or before September 30, 1965, in the amount of

---

[2] Although the parties have stipulated that Boniday was organized on Dec. 11, 1964, the stipulated materials also include various transactions in which Boniday participated on Dec. 1, 1964. The discrepancy in dates is unexplained.

$5,290,125 "with interest from date until paid, at the rate of 2.26837 per cent per annum, payable in advance."

The escrow instructions in respect of parcel No. 2 provided in part as follows:

On or before 25 years after the closing date of * * * [the escrow of parcel No. 1], I will hand you $808,300.00, the sum of $2,500.00 having been paid to seller outside of escrow, which you will deliver when you obtain Grant Deed and when you can issue your usual form of CLTA Standard policy of title insurance with liability not exceeding 810,800.00 on 32,432 [sic] acres of land being a portion of the lands described in your Preliminary Report dated November 18, 1964, No. 105147–LP and shown as Parcel No. 2 in the attached map, showing title vested in BONIDAY, INC., a California Corporation or nominee.

\* \* \* \* \* \* \*

Should the Buyer fail to complete closing hereunder, then and in that case all sums paid by the Buyer on account of the purchase price may be retained by the Seller as liquidated damages for such breach, and the Seller shall be released from all liability or obligation and the purchaser and Harris Goldberg shall have no further liability or obligation hereunder.

The $100,000 described as "prepaid interest" in the "Agreement of Sale" and the escrow instructions for parcel No. 1, and the $2,500, which was part of the purchase price of parcel No. 2, were paid by Boniday directly to the Devereux Foundation (and not deposited with the escrow agent) sometime in December, 1964.

Sometime in 1965 but before September 30, 1965, the date fixed for the closing of the escrow relating to parcel No. 1, Boniday became aware of certain theretofore unforeseen difficulties in connection with the instability of the soil and special requirements of governmental agencies in respect thereto. Because of these factors the escrow arrangements relating to parcels Nos. 1 and 2 never closed, and the promissory note in the amount of $5,290,125 pertaining to parcel No. 1 was never delivered to the Devereux Foundation as seller.

Thereafter, on September 11, 1965, a new "Agreement of Sale" was entered into by the Devereux Foundation and Goldberg "or his nominee or nominees," providing for the purchase of parcel No. 1 and for an option on parcel No. 2. Boniday was again designated and appointed Goldberg's nominee under this new "Agreement of Sale," and escrow instructions dated September 10, 1965, were executed by Boniday and the Devereux Foundation. The new escrow instructions called for performance by the parties and the closing of the escrow on or before October 15, 1965. An "Amendment to Agreement of Sale" was entered into by Goldberg and the Devereux Foundation bearing the date September 28, 1965, modifying the "Agreement of Sale" of September 11, 1965, but the record does not disclose the nature of these modifications. A "Second Amendment to Agreement of Sale"

bearing the date November 8, 1965, was entered into by Goldberg, Boniday, and the Devereux Foundation, further modifying the September 11, 1965, "Agreement of Sale." The second amendment provided for a new closing date of the escrow on January 15, 1967. It also provided for other modifications but the record does not disclose the nature of these changes. In respect of the $2,500 and $100,000 payments already made by Boniday to the foundation in connection with parcels Nos. 1 and 2, these new agreements provided: (1) That the $2,500 would be credited to the purchase price, and (2) that the $100,000 would be credited to interest due on a promissory note to be executed by Boniday at the closing date of the escrow. The record does not disclose any similar provision in respect to the $100 paid into escrow by Boniday in connection with parcel No. 1 at the time the original escrow instructions were executed.

The escrow under the instructions dated September 10, 1965, also never closed, and a dispute developed between Boniday and the Devereux Foundation concerning the various payments originally made by the corporation to the foundation in December, 1964. Boniday commenced proceedings in the U.S. District Court for the Central District of California, and an amended complaint was filed on September 20, 1967, consisting of several claims in respect of the agreements with the foundation for the purchase of the two parcels of land and the payments made in connection with such agreements. In its amended complaint Boniday alleged in respect of such payments as follows:

Goldberg paid to DEVEREUX the sum of one hundred two thousand six hundred dollars ($102,600.00) [($100,100.00 for parcel 1) and ($2,500.00 for parcel 2)] as down payment on the contract.

The $100,100 referred to above as paid in connection with parcel No. 1 consisted of the $100,000 described as "down payment" in the amended complaint and as "prepaid interest" in the December 1, 1964, "Agreement of Sale" and escrow instructions, and the $100 paid by Boniday into escrow at the time such escrow instructions were executed.

The foregoing litigation was settled sometime in October or November 1967, when a "Release And Indemnification Agreement" was entered into by Boniday, Wendy Goldberg, and the Titchers, which provided in part as follows:

3. "Claimants" [Boniday, Wendy Goldberg, and the Titchers], and each of them, do hereby forever release and waive any and all claim, right, title and interest in or to the real property owned by DEVEREUX in the County of Santa Barbara including, but not limited to, those arising out of the Agreement of Sale dated September 11, 1965 (and amendments thereto) and the said escrow instructions dated September 10, 1965 and the purported option rights to purchase the said 32.66 acre parcel referred to therein.

4. "Claimants", and each of them, do hereby release DEVEREUX from any and all claims for the refund or return of the said sum of ONE HUNDRED TWO

THOUSAND FIVE HUNDRED DOLLARS ($102,500.00), or any amount thereof and agree that said monies shall be retained by DEVEREUX.

\*          \*          \*          \*          \*          \*          \*

11. This release and the agreements contained herein shall become effective and binding upon the payment by or on behalf of DEVEREUX of the settlement sum in accordance with separate instructions to be given concurrently herewith to Title Insurance and Trust Company, Santa Barbara, California.

The "settlement sum" referred to in paragraph 11, which the Devereux Foundation paid in connection with the "Release And Indemnification Agreement" was $50,000.

Boniday had duly made an election to be treated for tax purposes as a U.S. small business corporation, and it filed an information return of income for 1964 with the district director of internal revenue at Los Angeles, Calif. The return reflected that the corporation had total assets of $100 as of December 31, 1964. Boniday reported no income for 1964. Its return, however, disclosed an "Interest" deduction in the amount of $100,000 in respect of the amount paid to the Devereux Foundation in connection with parcel No. 1. The return also reported a total net operating loss for 1964 in the amount of $100,100. On their tax return for 1964 the Titchers claimed a deduction in respect of one-half (or $50,050) of the $100,100 as their "share of net operating loss from Boniday, Inc., a U.S. small business corporation." The Goldbergs likewise claimed a deduction in respect of one-half (or $50,050) of the $100,100 on their 1964 tax return.

In his deficiency notices to the petitioners the Commissioner made the following determination in connection with the $100,000 claimed as an interest deduction on Boniday's return:

The amount of $100,000.00 deducted as interest is not allowed because it has not been established that the sum represented interest or was paid by Boniday, Inc., in the taxable year ended December 31, 1964, or was paid on a bona fide indebtedness, or did not distort taxable income.

Accordingly, the Commissioner disallowed the deductions claimed by petitioners in respect of their one-half portions of the $100,000 of Boniday's net operating loss for 1964 which was attributable to such interest deduction.

The issue for decision is whether the $100,000 payment made by Boniday to the Devereux Foundation in respect of parcel No. 1 is deductible by petitioners under section 163, I.R.C. 1954,[3] which pro-

---

[3] Sec. 221(a) of the Tax Reform Act of 1969, 83 Stat. 574–576, added a new subsection (d) to sec. 163 concerning "Limitations on Interest on Investment Indebtedness." Sec. 163(d)(4)(C) now also provides special rules in respect of investment indebtedness of a corporation electing to be taxed as a small business corporation under secs. 1371 and 1372, I.R.C. 1954. However, by sec. 221(b), Tax Reform Act of 1969, 83 Stat. 576, the amendments are effective for taxable years beginning after Dec. 31, 1971, and therefore do not apply to the taxable year here in issue.

vides that "There shall be allowed as a deduction all *interest paid* or accrued within the taxable year *on indebtedness*" (emphasis supplied). Interest, as the term is used in section 163 and defined in the cases, is that which one contracts to pay for the use of borrowed money, or the compensation paid for the use or forbearance of money. *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 560; *Deputy* v. *DuPont*, 308 U.S. 488, 498; *L-R Heat Treating Co.*, 28 T.C. 894, 896; *George T. Williams*, 47 T.C. 689, 692, affirmed 409 F. 2d 1361 (C.A. 6), certiorari denied 394 U.S. 997; *Rufus C. Salley*, 55 T.C. 896, 900. Moreover, the "indebtedness" upon which such a payment is made must be an "existing, unconditional, and legally enforceable obligation'" (*Lael Kovtun*, 54 T.C. 331, 338, affirmed per curiam 448 F. 2d 1268 (C.A. 9)) in order for the payment to be deductible under section 163. *Autenreith* v. *Commissioner*, 115 F. 2d 856, 858 (C.A. 3), affirming 41 B.T.A. 319; *George T. Williams*, 47 T.C. at 692, affirmed 409 F. 2d 1361, certiorari denied 394 U.S. 997; *Rufus C. Salley*, 55 T.C. at 900. It is also well settled that in determining whether a payment constitutes "interest * * * on indebtedness" economic realities govern over the form in which a transaction is cast. *Knetsch* v. *United States*, 364 U.S. 361; *Jack E. Golsen*, 54 T.C. 742, 753–754, affirmed 445 F. 2d 985 (C.A. 10), certiorari denied 404 U.S. 940; *Rufus C. Salley*, 55 T.C. at 900–901.

As we view the record before us, the $100,000 involved herein was not in fact paid as "interest" on an "indebtedness" in December 1964, but rather represented in substance the major part of the downpayment on the purchase price and was merely dressed up to look like "interest." We are fully satisfied that the $100,000 together with the $100 payment in fact represented the true downpayment for parcel No. 1. It overtaxes the imagination to accept the view that the downpayment on a contract to purchase over $5 million worth of real estate was only $100. Moreover, until the sale was actually consummated by transfer of title at the closing and until the Boniday note held by the escrow agent was in fact delivered to the seller at such closing there was no existing indebtedness running to it. Indeed the materials before us make clear that no such indebtedness was ever intended to be created, for the escrow instructions establish that the purchaser was to pay the full remaining balance of the purchase price in cash at the closing at the very time when the note was to be delivered to the seller. Thus, the note was to be fully discharged at the moment it was scheduled to be handed over to the seller. There was plainly not even a split second in time when it was contemplated that the purchaser would be obligated to pay the principal amount of the note and when bona fide interest could accrue thereon. The note was merely a prop in a charade that was obviously staged to enable the $100,000 payment to masquerade as "interest" on an "indebtedness."

In arguing that the $100,000 payment was made upon an unconditional and legally enforceable debt, petitioners contend that the "Agreement of Sale" of December 1, 1964, was an "unconditional agreement" for the purchase of parcel No. 1, and that such agreement thereby worked an equitable conversion vesting Boniday—as Goldberg's nominee—with equitable title to the property. They further argue that Boniday was able to defer payment of the $5,290,125 purported purchase price, for which it had executed an unsecured promissory note, until the planned closing of the escrow on September 30, 1965, 10 months later. According to the petitioners "It was for the forebearance, for the right to defer payment of the principal portion of the consideration that this sum of $100,000.00 was paid." We do not find this argument convincing.

The simple answer to petitioners' position is that the doctrine of equitable conversion is a "mere fiction" which operates in certain limited situations to determine who, between the buyer and seller, has "equitable" title to property. See *Parr-Richmond Industrial Corp. v. Boyd*, 43 Cal. 2d 157, 165–166, 272 P.2d 16, 22. For the purposes of this case, we think it far more significant that all the benefits and responsibilities associated with legal ownership of parcel No. 1 remained in the Devereux Foundation. The foundation, and not Boniday, was to be in possession of the parcel until the escrow closed, and was to be responsible for real estate taxes in respect of property. Any rents forthcoming from the property would presumably also have accrued to the foundation, and any liabilities arising from the property, whether in tort or otherwise, would have fallen upon the foundation. In such circumstances, we think Boniday never received a sufficient interest in the property which could be said to give rise to an "indebtedness" on its part.

Moreover, even if petitioners' argument in respect of "equitable conversion" were relevant, the very nature of the "equitable conversion" which they suggest took place was conditional and as such not sufficient to raise an "indebtedness." The purchaser had no obligation to pay the purchase price until the time for closing had arrived and the seller was able and willing to transfer title in accordance with the agreement. Under California law the equitable conversion, which occurs as a result of entering into a valid contract for the sale of land, does not become "absolute" until the date that the contract calls for conveyance of the property (i.e., the date of closing), and until one of the parties has performed or offers to perform its obligations under the contract. *Estate of Dwyer*, 159 Cal. 664, 675, 115 P. 235, 240. Similarly, "there is no equitable conversion where the contracting parties demonstrate an intention to the contrary" by setting conditions upon performance under the contract. *Parr-Richmond Industrial*

*Corp.* v. *Boyd*, 43 Cal. 2d at 166, 272 P. 2d at 22. By the terms of the December 1, 1964, "Agreement of Sale" Boniday's obligation to pay the "principal sum" ($5,290,125) was contingent in nature. Pursuant to paragraph 24 of the "Agreement of Sale" the entire agreement was conditioned upon the approval of the board of trustees of the Devereux Foundation which was to be received on or before December 12, 1964. Thereafter, under paragraphs 2 and 17 the sale was conditioned upon the ability of the foundation to convey such title to the property as had been agreed upon in accordance with a preliminary title report. Cf. *Parr-Richmond Industrial Corp.* v. *Boyd*, 43 Cal. 2d at 164-167, 272 P. 2d at 20-33. The $5,290,125 "principal sum" was not due until the closing of the escrow and compliance with these conditions. Since the escrow never closed and the land was never conveyed to Boniday no unconditional and legally enforceable obligation *existed* during 1964 or at any other time for the payment of the principal sum. In such circumstances, the $100,000 cannot be said to have been paid upon an existing "indebtedness" in 1964. *Lael Kovtun*, 54 T.C. at 337-338, affirmed 448 F. 2d 1268 (C.A. 9).

Petitioners also argue that the unsecured promissory note which Boniday delivered into escrow on December 1, 1964, constituted the underlying "indebtedness" required by section 163. They contend that by depositing the note in escrow Boniday parted with possession and control, including control over whether the note matured. Under California law, however, until the note matured and while it was held in escrow title to it remained in Boniday. Cf. *Hildebrand* v. *Beck*, 196 Cal. 141, 145-146, 236 P. 301, 303; *Norris* v. *San Mateo County Title Co.*, 37 Cal. 2d 269, 273, 231 P. 2d 493, 495; *Hastings* v. *Bank of America*, 79 Cal. App. 2d 627, 629, 180 P. 2d 358, 359; *Kellogg* v. *Curry*, 101 Cal. App. 2d 856, 859, 226 P. 2d 381, 383; *Vineland Homes, Inc.* v. *Barish*, 138 Cal. App. 2d 747, 750, 292 P. 2d 941, 945. Also, amounts deposited in escrow are deemed to be as much under the "control" of the depositor as the other party to the escrow inasmuch as the escrow holder is considered the agent of both parties; consequently, as a matter of California law "interest" on such deposit cannot arise during the period in which the amounts are held in escrow. *Riff* v. *Mayhew*, 90 Cal. App. 2d 712, 718, 203 P. 2d 812, 816.

Furthermore, regardless of whether Boniday itself could exercise any control over the note until it matured, its liability on the note was nevertheless still contingent upon the closing of the escrow. In fact, the escrow never did close because of certain unforeseen difficulties in connection with the soil composition and stability of the property and certain regulations of governmental agencies in respect thereto. Boniday therefore never did become liable on the note.

Boniday's note, moreover, was a straight promissory note, unsecured by any property or personal guarantee, and the balance sheet on its 1964 return disclosed total assets of only $100. Concerned as we must be with economic realities (*Knetsch* v. *United States*, 364 U.S. at 365–366; *Jack E. Golsen*, 54 T.C. at 753–754, affirmed 445 F. 2d 985 (C.A. 10) ; *Rufus C. Salley*, 55 T.C. at 900–901), and considering the unsecured nature of the promissory note together with Boniday's meager financial position, we think such circumstances at least cast grave doubt on whether the note was intended to evidence the existence of an actual indebtedness. Cf. *Tampa & Gulf Coast Railroad Company*, 56 T.C. 1393.[4]

In turn, we think these same economic considerations also cast doubt on whether the payment was in fact "interest" within the meaning of section 163. In the amended complaint filed in the action it commenced against the Devereux Foundation in 1967, Boniday, in fact, described the $100,000 payment made directly to the foundation as well as the $100 paid into escrow in respect of parcel No. 1 as a "down payment." We note also that under the terms of the December 1, 1964, "Agreement of Sale" and the escrow instructions relating to parcel No. 2, Boniday made a $2,500 downpayment on parcel No. 2, the purchase of which was not to close, if at all, until some years after the closing of the escrow of parcel No. 1. It seems unlikely to us that the contingent purchase of some 32 or 33 acres of land at some remote time required a downpayment of $2,500 whereas—as petitioners would have us believe—the immediate purchase of 215 acres of land required a mere $100 payment into escrow. We think the $100,000, which was paid to the foundation at the same time and in the same manner as the $2,500, was a payment of similar character, meant to secure purchase of the property, and not interest on a fictitious "indebtedness." Petitioners, however, argue that the payment was referred to as "prepaid interest" in both the December 1, 1964, "Agreement of Sale" and escrow instructions, and as "interest * * * payable in advance" in the promissory

---

[4] We similarly find little merit in petitioners' argument based on *L–R Heat Treating Co.*, 28 T.C. 894, and Rev. Rul. 69–188, 1969–1 C.B. 54, that under sec. 163 an indebtedness need not be in existence at the time the payment of interest is made. The taxpayer in *L–R Heat Treating Co.* executed certain notes in return for loans of amounts less than the face value of the notes. The differences between the amounts of the loans and the face value of the notes were "premiums" the taxpayer paid in order to obtain the borrowed capital. Consequently, such premiums were held to constitute "interest". *L–R Heat Treating Co.*, 28 T.C. at 896–897. The payments there in question occurred simultaneously with the creation of the indebtedness inasmuch as the amounts were merely withheld from the loans giving rise to such indebtedness. Rev. Rul. 69–188 similarly concerned a situation where the loan giving rise to the indebtedness was forthcoming upon payment which was made, although the indebtedness was not "already in existence" when the payment was made and did not arise simultaneously with the interest payment as in *L–R Heat Treating Co.* Rev. Rul. 69–188, 1969–1 C.B. 54. Such is not the situation in the case before us. Boniday's obligation was still uncertain and conditional after the $100,000 payment was made, and, in fact, never did arise.

note executed by Boniday on the same date. They contend that dispositive weight should be given to the characterization of the $100,000 payment in these documents. But such is not the law. Of primary importance is the true nature of the payment made and not the label affixed thereto, or the form in which it is cast. *Autenreith* v. *Commissioner*, 115 F. 2d at 858 (C.A. 3), affirming 41 B.T.A. 319; *Dorzback* v. *Collison*, 195 F. 2d 69, 72 (C.A. 3), affirming 93 F. Supp. 935; *Court Holding Co.*, 2 T.C. 531, 536, reversed on another point 143 F. 2d 823, reversed 324 U.S. 331; *L-R Heat Treating Co.*, 28 T.C. at 897; *James A. Collins*, 54 T.C. 1656, 1664.

Because we think that the payment in issue was not "interest" and that there was no valid existing "indebtedness" owed by Boniday in 1964, we find it unnecessary to consider the other basis of the Commissioner's determination that the "prepayment," in any event, distorted income. Cf. Rev. Rul. 68-643, 1968-2, C.B. 76; Michael Asimow, "Principle and Prepaid Interest," 16 U.C.L.A. L.Rev. 36 (1968-1969); Lewis R. Kaster, "Prepaid Interest Purchase Method Still Useful Despite IRS Attack," 30 J. Taxation 16 (Jan. 1969). Petitioners have not raised any issue or presented any argument to support the deductibility of the payment in controversy for 1964 under any other section of the Code, nor is any taxable year other than 1964 involved in these proceedings.[5] We accordingly approve the Commissioner's determination.

*Decisions will be entered for the respondent.*

---

[5] To the extent that any deduction (other than as interest) might be allowable in respect of the $100,000 payment or a portion thereof, it would seem that the proper year would be 1967 when the litigation regarding that payment was settled on an approximately 50–50 basis.