ANN S. RUSSO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4598–75. Filed April 28, 1977.

*Paul E. Anderson,* for the petitioner.
*James H. Ross, Jr.,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of $24,738.96 in the petitioner's 1971 Federal income tax. The issues for decision are: (1) Whether a transaction in which a partnership purported to sell property is to be treated as a sale for Federal income tax purposes; (2) whether amounts designated as "points" and prepaid interest in the sale agreement should be treated as interest for Federal income tax purposes, or whether some portion of them should be treated as part of the purchase price of such property; (3) whether any portion of the gain from the sale qualifies for long-term capital gain treatment since the construction of the building was commenced more than 6 months before the sale but not completed until within such 6 months; (4) whether the petitioner's interest in certain property was disposed of by a "sale" within the meaning of section 1211, I.R.C. 1954,[1] when the property was sold at a trustee's sale to satisfy an obligation for which she had no liability and when

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect for the year at issue.

she received nothing from the sale; and (5) whether a joint venture, in which the petitioner was a participant, was entitled to use the accrual method of accounting on its 1971 Federal income tax return.

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Ann S. Russo, maintained her legal residence in Atherton, Calif., when she timely filed her petition herein. She filed her 1971 Federal income tax return with the Internal Revenue Service.

The petitioner acquired a one-third interest in a partnership named Five Hundred Five Hamilton (the seller) on October 29, 1970, for $50,000. As of that date, the partnership was in the process of having constructed a three-story, 30,000-square-foot office building on land it owned on Hamilton Avenue in Palo Alto, Calif. It had acquired such land from Keith E. Garner, one of its members. To finance the construction, a $697,500 loan was obtained from the Bank of America, but subsequently, when funds were necessary to make payments on the loan, the petitioner advanced another $21,000.

The contractor in charge of the construction, a corporation controlled by Mr. Garner, wrote to the petitioner on July 1, 1971, stating that the office building had been completed and requesting that she start making a monthly payment for part of its maintenance cost. However, in a notice of completion recorded in the land records office for the County of Santa Clara, the completion date was stated to be July 3, 1971. When the building was completed, it was a "shell building," that is, only the exterior had been constructed; the interior was to be finished when tenants were obtained and their requirements ascertained.

Sometime in early December 1971, negotiations began between the seller and the representatives of a group of investors, completely unrelated to the seller, for the sale of the Hamilton Avenue property. The initial asking price for the property was $1.2 million, and under an early proposal on behalf of the investors, they were to make a $10,000 downpayment on such amount, and pay $250,000 in points

and $80,000 in prepaid interest. The principal balance was to be financed by the seller, but the term of the obligation and the interest rate were not settled at that time. The group of investors then formed a limited partnership, Hamilton Avenue Properties (the buyer), to acquire ownership of the property, and on December 29, 1971, such partnership entered into an agreement with the seller for the purchase and sale of the property.

Under the terms of the agreement, the purchase price remained at $1.2 million; however, the required downpayment was increased to $12,000, the loan points were decreased to $140,000, and the interest for 1972 (calculated at an annual rate of 8¼ percent) was set at $97,658—all such amounts were to be paid upon the closing of the agreement. The seller agreed to carry a note for the unpaid portion of the purchase price and was to manage the property in accordance with a standard management contract. If the building did not produce sufficient funds for its operation, the seller, as manager, was to provide such funds, and if there was a net cash flow, the first $2,075 per month was to be retained by the buyer. Any cash flow in excess of such amount was to be used to meet the buyer's obligation under the note, but if such amount was insufficient, or if the building produced no cash flow, the seller agreed to defer payment of that installment. In addition, the seller agreed, at its own expense, to install fixtures and complete the interior of the building, until it was 100-percent occupied, including interior walls, partitions, doors, painting, papering, paneling, floor covering, light fixtures, and heating, ventilating, and air conditioning work. In the agreement, the seller and buyer agreed to allocate the purchase price as follows:

| | |
|---|---|
| Personal property | $200,000 |
| Land value | 235,000 |
| Building | 765,000 |

The buyer considered the $1.2 million purchase price of the property to be reasonable in light of its projected income, as estimated by Mr. Garner and evaluated by its real estate broker. In addition, the buyer was satisfied that Mr. Garner and the petitioner could properly manage the property and

fulfill the income projections, since it had investigated their reputation and experience and received favorable reports.

In all other documentation in connection with the sale, the parties consistently treated the amount of points to be $140,000 and the amount of prepaid interest for 1972 to be $97,658.

The closing of the agreement of sale took place on December 31, 1971. The buyer executed a note and a deed of trust, and on December 31, 1971, the deed of sale for the Hamilton Avenue property was recorded. On January 1, 1972, the buyer executed a standard management contract, in which the manager assumed the financial responsibilities set forth in the sale and purchase agreement. The manager was to receive, as part payment for its services, 4 percent of the gross rentals prior to any payment of net cash flow. In connection with the sale, the seller paid $60,000 to a broker for his services in arranging the sale.

In early 1974, payments on the construction loan secured by the Hamilton Avenue property ceased, and in October 1974, the lender, the Bank of America, foreclosed on such property. At the foreclosure sale, the bank's bid of $628,189.56 was accepted. Ultimately, the bank sustained a loss of $113,462.66 with respect to such property. The buyer submitted no bid at the foreclosure sale because, without the financial guarantees made by the seller in the management contract, it was unwilling to take the financial risks of the building.

In the partnership return filed by the buyer, it deducted the full amount of the points and the prepaid interest, and such treatment had not been challenged by the Commissioner. The partnership return filed by the seller for 1971 reported the receipt of interest income of $178,058. Such amount was computed by subtracting from the total interest income the amount of $60,000, which is equal to the amount of the commission paid to the broker for the sale of the property. On her 1971 Federal income tax return, the petitioner reported interest income from the partnership in the amount of $32,552.67.

On December 17, 1969, the petitioner and another individual acquired from Lelia Dini a parcel of real estate located in Gilroy, Calif., consisting of 2½ acres of land and a house (Gilroy property). The purchase price of the property was

$100,013.90, approximately $25,000 was paid as a downpayment, and the purchasers executed a note to the seller for $37,500. In addition, the property was subject to a first deed of trust in the amount of $37,500, which secured an obligation of Mrs. Dini to George Duffin, an individual who had sold the property to her. On October 1, 1970, the petitioner paid in advance her obligation under the note to Mrs. Dini and received a discount of $5,750.

Subsequently, Mrs. Dini defaulted on her obligation to Mr. Duffin, and on June 3, 1971, he foreclosed on the Gilroy property. At the trustee's sale, Mr. Duffin bid $41,572.59 for the property, the amount of unpaid indebtedness owed to him by Mrs. Dini, and such bid was accepted. The trustee then conveyed title to him. At the time of the foreclosure, there were delinquent real estate taxes outstanding against the property in the amount of $1,522.58.

During 1971, the petitioner was a member of a joint venture called Nine Sixty Nine Maude (969 Maude). The joint venture commenced business in 1968, and according to the testimony of the IRS agent who audited its Federal partnership returns for 1969, 1970, and 1971 and who had inspected its books and records for 1968 (including a copy of its partnership return for that year), 969 Maude elected to follow the cash method of accounting in determining its income for 1968. The agent obtained a copy of the joint venture's 1968 return from the accountant who prepared it, but such copy was not offered into evidence in this case. The Commissioner was unable to produce the joint venture's return for 1968 because it had been routinely destroyed in accordance with a program of eliminating returns more than 6 years old; but no explanation was offered for the petitioner's failure to produce a copy of such return. During the years 1969 through 1971, 969 Maude computed its partnership income on the accrual method of accounting, although it had never sought or secured the Commissioner's permission to change its method of accounting.

In the petitioner's 1971 Federal income tax return, she reported her distributive share of the gain from the sale of the Hamilton Avenue property as long-term capital gain, in addition to the interest income reported therefrom; she treated the loss she sustained upon the foreclosure and sale of

the Gilroy property as an ordinary loss; and she deducted her distributive share of the loss reported by 969 Maude in its 1971 Federal partnership return. In computing the loss of 969 Maude, accrued but unpaid taxes had been deducted. The Commissioner, in his notice of deficiency, determined that the total amount of points and prepaid interest received by the seller constituted interest income, and that the gain from the sale was short-term capital gain. He also determined that the loss from the Gilroy property was a capital loss. Finally, he determined that 969 Maude was not entitled to use the accrual method of accounting and, consequently, was not allowed to deduct accrued but unpaid taxes in computing its income for 1971. Appropriate adjustments were made in the petitioner's income to reflect those changes.

OPINION

The first issue we must decide concerns the proper tax treatment to be accorded the purported sale of the Hamilton Avenue property on December 31, 1971. Resolution of that issue depends on a number of subsidiary questions, and we will deal with each of them in turn.

The petitioner makes no attempt to support the way in which the interest income was treated on the returns filed by the seller-partnership or by her for 1971; that is, she makes no contention that the commission paid to the broker for the sale of the Hamilton Avenue property should be offset against such interest income. Instead, she presents several other arguments designed to show that no part of the sale proceeds is taxable or that the interest income is not taxable as such, in whole or in part.

First, the petitioner argues that the purported sale by the seller of its Hamilton Avenue property was a sham; she asserts that, in reality, the buyer loaned the seller the amounts it paid at the closing—over $250,000. In support of this contention, the petitioner points to a number of items: If the building produced a monthly net cash flow, the buyer had a claim to the first $2,075 of such funds prior to its obligation to make payment on the unpaid portion of the purchase price. On an annual basis, such priority payments could total $24,900, or 9.96 percent of the amount "loaned" to the seller. Thus, the petitioner considers such priority payments as, in

substance, interest. The reason for the charade, according to the petitioner, was simply to allow the purported buyer to "buy" some deductions. Although the petitioner spins an interesting theory in her attempt to characterize the transaction, unfortunately for her it must remain a theory because there is no evidence in this record to support it; the evidence of record shows that the transaction was exactly what it appeared to be—a bona fide sale in 1971.

The parties to the transaction were completely unrelated— the buyer had no prior business dealings with any of the partners of the seller, and there was no reason to believe that the parties would deal with each other, other than at arm's length. The petitioner's attorney conducted an extensive cross-examination of the general partner of the buyer, but never did the attorney pursue the possibility that the sale was in fact a loan and that the parties had so intended. Moreover, the petitioner also testified, but she offered no testimony to support the theory now being suggested. Indeed, she testified that the building was sold, and never qualified her statement to suggest that in fact the arrangement was otherwise.

Furthermore, the loan theory conflicts with the realities of the transaction. It is difficult to understand why the seller would disguise a loan as a sale and treat the transaction as involving gain, if such were not in fact the truth. Also, it is very unrealistic to assume that the seller would be willing to treat amounts designated as prepaid interest and points as ordinary income, if in fact such amounts constitute merely a nontaxable loan. Moreover, there was no obligation on the part of the seller to repay the amounts which the petitioner now asserts were a loan, and the seller paid a $60,000 commission to a broker for having arranged the sale. It is difficult to believe that a borrower would have been willing to pay such a fee for a $250,000 loan, since it amounts to more than 20 percent of the purported loan.

In addition, the priority payments of $2,075 per month, which the petitioner claims were interest payments on the loan, were subject to contingencies. Such payments were to be made only if the building produced a net cash flow, and the manager's right to receive 4 percent of the rentals took precedence over the buyer's right to receive the priority payments. It is difficult to accept that the buyer, if in fact

there was a loan, would agree to interest payments being made subject to such contingencies.

Finally, the petitioner's theory ignores the fact that in subsequent litigation between the seller and buyer arising out of the sale transaction, the claims and counterclaims were framed in terms of the parties' obligations under the sale and management contracts; the buyer did not cast aside a sham transaction and seek to recover on a loan. The evidence overwhelmingly establishes that the parties to the sale negotiated at arm's length, and a bona fide sale took place on December 31, 1971.

The next question we must decide is whether amounts designated as points and prepaid interest are to be treated as such for Federal income tax purposes, or whether such amounts actually represent a part of the downpayment of the purchase price. The petitioner again urges that we not follow the terms of the sale transaction insofar as it purports to require the buyer to pay points and prepaid interest, even though such amounts were arrived at after arm's-length negotiations and even though such amounts were consistently treated by the parties in accordance with the labels attached to them: the buyer deducted such amounts from income, without a challenge from the IRS; and the seller treated such amounts, reduced by the broker's commission it paid, as ordinary income.

It is axiomatic that in matters of Federal taxation, substance controls over form, and we are not bound to accept without question the labels used by parties to an agreement in determining the proper tax consequences. *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); *Titcher v. Commissioner*, 57 T.C. 315, 322 (1971); *L-R Heat Treating Co. v. Commissioner*, 28 T.C. 894, 897 (1957). However, in the type of situation before us, were we to allow one party to cast aside provisions of a contract, we would be creating the possibility of inconsistent treatment by the parties to the transaction, each seeking the most favorable tax treatment. For example, in this case, the petitioner is seeking to treat the amounts designated in the contract as points and prepaid interest as part of the gain from a sale, reportable as a long-term capital gain; while the buyer of the property, not

a party to this litigation, has already deducted such amounts without a challenge from the Commissioner.[2] In an analogous situation, we have required "strong proof" before a party can sustain his burden of showing that amounts designated in an arm's-length contract as "goodwill" or as allocable to a "covenant not to compete" are without economic substance. *Lucas v. Commissioner*, 58 T.C. 1022, 1032–1033 (1972); *Schmitz v. Commissioner*, 51 T.C. 306, 315–318 (1968), affd. sub nom. *Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972); cf. *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), on remand 50 T.C. 782 (1968). Such a rule may be appropriate in this situation, but we need not decide that question in this case, because even under the usual burden of proof, the petitioner has not shown, based on the evidence of record, that amounts designated as points or prepaid interest represent, in substance, part of the downpayment.[3]

First, it is asserted by the petitioner that a downpayment of $12,000, or 1 percent of the purchase price, was unreasonably low for a realty sale in northern California in 1971; the normal downpayment would have been 20 percent. Next, it is claimed that the prepaid interest could, under certain conditions, be credited against the outstanding purchase price so that such amount was in effect a disguised payment of principal, in accordance with our holding in *LaCroix v. Commissioner*, 61 T.C. 471 (1974). It is further argued that based upon an assumed downpayment of 20 percent, the loan fee would not have exceeded 1 percent of the sales price, rendering 11 of the 12 points paid by the buyer in reality part of the downpayment. Finally, the petitioner contends that all of the points cannot represent interest because it would violate California's usury statutes.

---

[2] Obviously, we do not imply that with respect to the prepaid interest it may be deducted, in whole or in part, in the year of payment. See *Burck v. Commissioner*, 63 T.C. 556 (1975), affd. 533 F.2d 768 (2d Cir. 1976); *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976). Nor do we intimate that amounts designated as loan points are necessarily deductible in the year of payment. See *Lewis v. Commissioner*, 65 T.C. 625, 629 (1975); *Anover Realty Corp. v. Commissioner*, 33 T.C. 671 (1960); cf. *Burck v. Commissioner, supra; Sandor v. Commissioner, supra.*

[3] In light of our resolution of this issue, we do not need to consider the Commissioner's contention that the petitioner did not timely raise the issue that the prepaid interest should be treated as part of the downpayment.

The petitioner's assumption that a downpayment of less than 20 percent for the transaction before us cannot reflect economic reality is without any support in this record. An associate general manager of the real estate investment department of Prudential Insurance Co. of America testified that, in general, it was his company's policy in 1971 to require a downpayment of 20 percent, although under certain circumstances, it would accept a 1-percent downpayment. This testimony is relied upon by the petitioner to establish her assertion, but it falls far short of doing so. An insurance company may have more conservative financing requirements than other lenders, so that the testimony as to Prudential's downpayment policy may reflect only its policy and may not be indicative of the real estate market generally in northern California during 1971. Cf. sec. 461(g)(2), as added by the Tax Reform Act of 1976, sec. 208(a), 90 Stat. 1542. Moreover, under certain circumstances, Prudential accepted a 1-percent downpayment. Thus, on this record, we cannot conclude that a 1-percent downpayment for the transaction before us is so grossly inadequate that some part of the prepaid interest or points must necessarily be considered to be part of the downpayment.

The case of *Titcher v. Commissioner, supra,* relied upon by the petitioner, is clearly distinguishable because there it was claimed that $100 represented the total downpayment required for the purchase of real estate with a sales price of over $5 million. We concluded that $100,000, labeled prepaid interest, actually represented part of the downpayment and supported our view, in part, by pointing to the miniscule amount of the downpayment, representing less than .002 percent of the purchase price. Here, in sharp contrast, the downpayment was 1 percent of the purchase price, or 500 times larger than the percentage in *Titcher.*

Nor is there any merit to the claim that the prepaid interest was in substance a disguised principal payment, such as we found to exist in *LaCroix v. Commissioner, supra.* In that case, an amount designated as prepaid interest was to be credited, at stated dates, against the unpaid purchase price. Here, there is no similar treatment accorded to the amount designated as prepaid interest: it simply took the place of

interest which would have been paid in 1972 and did not reduce the unpaid purchase price.

In addition, the petitioner has failed to establish that the charging of 12 points in the transaction before us was unreasonable. The officer of Prudential testified that when they obtained a 20-percent downpayment, they required only 1 point to be paid. However, the transaction herein involved a much smaller downpayment, and we are without knowledge of the risk factors considered by Prudential in determining its charge for points; nor do we know what charge they would have made in this case. Obviously, we are not deciding that a charge of 12 points is necessarily or even ordinarily economically justified; rather, upon this record, we are unable to conclude that the petitioner has established otherwise. Indeed, the only evidence which is of any relevance to this question is the testimony of the general partner of the buyer. While his testimony must be considered in light of the fact that his partnership deducted the full amount of the points and he has an interest in not disturbing that deduction, still, his testimony was sufficient to establish that 12 points was not outside the range of an amount which could be justified economically. He testified that many FHA loans with low downpayments required between 15 and 17 points. In addition, he stated that in 1971 the money market was tight and considering the risk factors—the low amount of the downpayment and the terms and duration of the repayment— a loan fee of 12 points was reasonable. Cf. sec. 461(g)(2), as added by the Tax Reform Act of 1976, sec. 208(a).

Finally, we find no merit in the petitioner's contention that some part of the points must be considered to be part of the downpayment, for otherwise the points charged would violate California's usury law. The petitioner's contention is grounded upon her claim that the points would be treated under California usury law as interest paid in 1 year. That claim is contrary to California usury law which provides that the interest rate is to be recomputed by reducing the stated principal amount of the loan by the amount of the points. *Lewis v. Pacific States Savings & Loan Co.*, 1 Cal. 2d 691, 37 P.2d 439 (1934); *Forte v. Nolfi*, 25 Cal. App. 3d 656, 102 Cal. Rptr. 455 (1st Dist. Ct. App. 1972); *Devers v. Greenwood*, 139 Cal. App. 2d 345, 293 P.2d 834 (2d Dist. Ct. App. 1956); *Otis v.*

*I. Eisner Co.*, 7 Cal. App. 2d 496, 46 P.2d 235 (3d Dist. Ct. App. 1935). Applying that formula to the transaction herein results in an interest rate not in excess of 10 percent, the maximum allowable for the transaction before us. See Cal. Const. of 1879, art. 20, sec. 22, Interest Rates (1934) (now at art. 15, sec. 1 (1976)). In any event, even if the amount of interest charged exceeded the legal limit, such fact does not change the income tax consequences of such interest income and require us to hold that it really represented part of the downpayment. See *Arthur R. Jones Syndicate v. Commissioner*, 23 F.2d 833, 834 (7th Cir. 1927), revg. on another ground 5 B.T.A. 853 (1926); *Shaw v. Commissioner*, 59 T.C. 375, 382–383 (1972); *Gatlin v. Commissioner*, 34 B.T.A. 50, 55–56 (1936); cf. *James v. United States*, 366 U.S. 213 (1961); *Rutkin v. United States*, 343 U.S. 130 (1952). Consequently, we conclude that the petitioner's partnership received ordinary income in the amount of the prepaid interest and points paid to it in 1971.

Next, we must decide the nature of the gain realized by the seller on the sale of its Hamilton Avenue property on December 31, 1971. Section 1231(a) provides that the gain recognized from the sale of "property used in the trade or business," to the extent that it exceeds the recognized losses from such property, shall be considered to be a gain from the sale or exchange of a capital asset held for more than 6 months. Section 1231(b) defines "property used in the trade or business" to mean generally property which is subject to the allowance for depreciation in section 167 and which is held for more than 6 months and real property used in the trade or business. In this case, the Commissioner does not dispute that the Hamilton Avenue office building and the land on which it was located were used in the seller's trade or business. The only dispute between the parties concerning the applicability of section 1231 is whether the seller held the property for more than 6 months.

Since the sale occurred on December 31, 1971, the petitioner must show that as of June 29, 1971, the seller owned both the land and the completed building in order to qualify all of the proceeds for long-term capital gain treatment. However, there is a conflict in the evidence as to when the building was completed: The petitioner testified that on June 15, 1971, the exterior of the building was completed. On

the other hand, in the letter dated July 1, 1971, and written by Mr. Garner on behalf of the contractor constructing the building, he stated that the building was finished and then proceeded to ask the petitioner for a monthly amount to cover maintenance charges; thus, that letter suggests that at the latest, the building was completed on July 1, 1971. Yet, in a notice of completion filed with the land records office for the County of Santa Clara, Calif., the completion date was set forth as July 3, 1971.

It is the petitioner's position that her testimony ought to be accepted as determining the completion date to be June 15, 1971, so that it was more than 6 months before the sale date. However, we are not convinced that the petitioner could remember with such specificity the date she visited the building and saw that it was complete. In connection with dating other events relating to her interest in the seller, she demonstrated that her memory was not very clear and specific: When she was asked in cross-examination the date she entered into the partnership with Mr. Garner, she replied: "It was in 1970, wait a minute, no 1971." When the attorney asked "It was in 1971?" she responded "I can't remember really." The actual date of the agreement was October 29, 1970. Thus, the petitioner was not sure if an event in the fall of 1970 occurred in 1970 or 1971, but she asks us to accept that her memory about an event 8 months subsequent was so sharp and crisp that she could recollect it to the very day of the month. We are unable to do so, particularly in light of the fact that her answer was in response to a question by her attorney in which he provided the specific date. In our judgment, the information contained in the notice of completion and filed in the land records office of the county represents the most reliable evidence of the completion date (cf. *Dorman v. United States*, 296 F.2d 27, 31 (9th Cir. 1961)), and accordingly, we find July 3, 1971, to be the completion date.

Having so concluded, we are then faced with the question of whether any part of the gain attributable to the building may be said to have been realized from "property" held for more than 6 months. In other words, can a partially completed building constitute a separable part of the property being sold, or is the total building to be considered as one unit, so that if

any part of the building is not completed more than 6 months before its sale, none of the building has met the requisite holding period. Originally, in *Paul v. Commissioner*, 18 T.C. 601, 603–604 (1952), we took the position that a building was an indivisible unit so that the holding period began to run as of the date of its completion. However, on appeal, we were reversed by the Third Circuit (206 F.2d 763 (1953)), which held that an apportionment should be made of the basis of the building attributable to work completed more than 6 months prior to the sale. That percentage would then be applied to the total amount of the gain to determine the portion thereof which was long-term capital gain. When the issue came before us again in *Draper v. Commissioner*, 32 T.C. 545 (1959), we reconsidered our prior position and decided to follow the Third Circuit's apportionment view.

Since the petitioner is claiming long-term capital gain treatment for the gain realized on the sale of the Hamilton Avenue property, she has the burden of proving her right to such treatment. Rule 142(a), Tax Court Rules of Practice and Procedure; see *Paul v. Commissioner*, 206 F.2d at 766; *Draper v. Commissioner, supra* at 549. Nevertheless, she failed to offer any evidence to establish the total cost of the portion of the building completed as of June 29, 1971. Instead, in her brief, the petitioner suggests that such portion of completion is represented by a formula in which the numerator is the number of days of construction ending on June 29, 1971, and the denominator is the total number of days of construction. She urges that by applying such formula to the total gain realized on the sale, we can secure the portion of such gain with respect to which she is entitled to long-term capital gain treatment.

The petitioner's proposal suffers from several weaknesses: First of all, the petitioner's suggested calculation assumes that the construction of a building proceeds linearly, a proposal which is difficult to accept in the abstract and which is without any support in this record. Obviously, there is no necessary correlation between the percentage of completion based on the running of time and the cost incurred during such time; the cost of a building may be "back end loaded" so that a substantially disproportionate part of the cost occurs at the end—indeed, perhaps within the final days. In this case,

there is also the further complication that the seller was obligated to complete the interior of the building, and nothing of record would allow us to conclude that the basis reported by the partnership, $697,500,[4] did not include such estimated costs. The parties allocated $200,000 of the purchase price to "personal property," and it may be that such amount included the approximate value of the items to be installed in the interior of the building. Thus, some amount of the reported basis may not have been spent prior to the sale. In light of considerations such as these, we indicated in *Aagaard v. Commissioner*, 56 T.C. 191 (1971), that even though the parties had stipulated the percentage of completion as of the relevant date, such evidence was insufficient to enable the petitioner to prove with accuracy the cost of the completed portion of the building. Accordingly, in that case, we sustained the Commissioner's determination of the cost of the completed portion of the building.

Despite the shortcomings in the petitioner's proposal, it would be inequitable, in light of our adoption of the apportionment rule, for us to conclude in this case that no part of the building was completed more than 6 months before its sale, when it is apparent that a substantial portion of the building had been completed before that date. The problem before us is analogous to that presented in *Cohan v. Commissioner*, 39 F.2d 540, 544 (2d Cir. 1930), where the Second Circuit, in an opinion written by Judge Learned Hand, held that although a taxpayer may have completely failed to establish with any degree of accuracy the amount of business expenses he had incurred, as long as the trial court was satisfied that some amount was in fact spent, then it must make an approximation, "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." The court went on to comment:

But to allow nothing at all appears to us inconsistent with saying that something was spent. * * * The amount [allowed] may be trivial and unsatisfactory, but there was basis for some allowance, and it was wrong to

---

[4] The Commissioner increased the partnership's basis by $153,000, representing additional capital contributions by the partners. This increase may include, for example, the amounts advanced by the petitioner, although the source and dates of such contributions are not in the record.

refuse any * * *. It is not fatal that the result will inevitably be speculative; many important decisions must be such. * * *

Such rationale is equally applicable in this case, and in cases of this type, we will make as reasonable an allocation as we can. Obviously, the more complete the record, the more likely it will be that a taxpayer can establish his suggested allocation. In this case, after resolving all the doubts previously described against the petitioner, we conclude that 40 percent of the gain is short-term capital gain and 60 percent is long-term capital gain.

The next issue for decision is whether the petitioner sustained a capital or an ordinary loss when she lost her interest in the Gilroy property upon its foreclosure and sale. The petitioner contends that because she never attempted to stop the foreclosure or bid in on the property, she abandoned it and therefore is entitled to an ordinary loss under section 165. On the other hand, the Commissioner contends that under the Supreme Court's decision in *Helvering v. Hammel,* 311 U.S. 504 (1941), the petitioner lost her interest in the property pursuant to a "sale," albeit an involuntary one, and consequently, the loss is a capital loss.[5]

In *Helvering v. Hammel,* a syndicate had purchased a plot of land under an installment land contract. Before the purchase price was paid in full, the syndicate defaulted, and the vendor instituted foreclosure proceedings which resulted in a judicial sale of the property. The vendor became the purchaser of the property, and a deficiency judgment was obtained against the members of the syndicate. The taxpayer, one of the members of the syndicate, argued that the loss was ordinary because there was no "sale" within the meaning of the predecessor of section 1211, limiting the deductibility of losses sustained on the sale of capital assets. There was no dispute that the foreclosure sale finally liquidated the capital investments made by the members of the syndicate and fixed the precise amount of the loss claimed by the taxpayer. However, the taxpayer contended that a forced sale was not subject to the capital loss provisions because they only applied to "sales" which were voluntarily made by the taxpayer. The Supreme Court rejected the argument and held that a forced sale

---

[5] The petitioner does not dispute that the property was a capital asset.

constituted a "sale" for purposes of the predecessor of section 1211.

In this case, the petitioner also recognizes the trustee's sale of the Gilroy property eliminated her interest in the property and fixed the precise amount of her loss.[6] However, she argues that the facts in this case are sufficiently distinguishable from *Helvering v. Hammel* to warrant the conclusion that no "sale" occurred for purposes of section 1211. It is claimed that the petitioner received no consideration upon the foreclosure, since no obligation of hers was satisfied. The foreclosure involved two completely unrelated parties, and she did not participate in it. Thus, the claimed distinction is that since in this case, no obligation of the petitioner's was in any way satisfied by the trustee's sale, there was no "sale" of any kind, not even an involuntary one. We do not need to pause and consider whether it can be said that the satisfaction of the taxes owing on the property constituted consideration to the petitioner, as urged by the Commissioner, because, for purposes of a "sale" under section 1211, it is irrelevant whether the "seller" receives consideration. Such conclusion appears to follow from the *Hammel* decision, but subsequent cases have explicitly so held.

Shortly after the Supreme Court's decision in *Hammel*, the Ninth Circuit, in *Commissioner v. Peterman*, 118 F.2d 973 (1941), modifying on this issue a Memorandum Opinion of this Court, concluded, under the the authority of *Hammel*, that sale of property in a tax foreclosure constituted a "sale," even though under State law the real estate taxes were not a personal liability of the owner of the property. The Court rejected the lack of consideration argument, observing that just as in the cases of a foreclosure where a personal liability is satisfied, the owner is deprived of his property and there is

---

[6] Although she characterizes her loss as arising from an abandonment of the property, she points to the events connected with the trustee's sale to show such an abandonment, that is, her decision not to bid in on the sale or to negotiate with Mr. Duffin. In any event, on this record, we would be unable to conclude that the petitioner gave up any claim to her interest in the property other than as a result of the trustee's sale. Nothing suggests, for example, that had the trustee's sale resulted in proceeds in excess of the amount due to Mr. Duffin, the petitioner would have refused them. Cf. *Commissioner v. Abramson*, 124 F.2d 416, 417 (2d Cir. 1942), affg. on this issue a Memorandum Opinion of this Court.

little difference to him when considered "In the revealing light of practicality." 118 F.2d at 977.

Less than 2 months thereafter, the Supreme Court decided the case of *Helvering v. Nebraska Bridge Supply & Lumber Co.*, 312 U.S. 666 (1941), and reversed, in a per curiam opinion, the Eighth Circuit (115 F.2d 288 (1940)) which had held that upon a tax foreclosure of property there was no "sale" because the owner did not receive any consideration for it. Under Arkansas law, the relevant State law, real estate taxes created a lien against the property but were not the personal liability of the owner. For that reason, the Court of Appeals had concluded that the owner received no consideration because no liability of his was satisfied by the foreclosure. The Supreme Court's reversal, of the Eighth Circuit's holding clearly indicates that consideration flowing to the seller is not necessary for a "sale." Less than a month after the Supreme Court's opinion in *Nebraska Bridge*, the Second Circuit, in *Commissioner v. Abramson*, 124 F.2d 416, 417 (1942), revg. on this issue a Memorandum Opinion of this Court, reached the same conclusion, relying in part on the Supreme Court's opinion in *Nebraska Bridge*.

Finally, in *Welch v. Street*, 116 F.2d 953 (1st Cir. 1941), a "sale" was found in a case with facts virtually identical to those herein: The obligation and default giving rise to the foreclosure was that of the person who had previously owned the property, just as herein it was the petitioner's seller, Mrs. Dini, who defaulted. The court held there was a sale in spite of the fact that no consideration was received by the taxpayer. Accordingly, we hold there was a sale of the petitioner's interest in the Gilroy property and that the loss was a capital loss.

The last issue to be decided is whether 969 Maude was entitled, in 1971, to use the accrual method of accounting for Federal income tax purposes. The Commissioner determined that 969 Maude was not entitled to use the accrual method for 1971, because in its first partnership return, filed for 1968, it followed a cash method of accounting and deducted taxes when paid, not when accrued, and because it had never secured his approval to change its method of accounting. The partnership's 1968 return had been destroyed in accordance with the Government's program of routinely destroying

returns more than 6 years old. Accordingly, the agent, who conducted the audit of the partnership's returns for 1969, 1970, and 1971, obtained a copy of the 1968 return from the accountant who had prepared it for the partnership and checked it together with the other records of the partnership for that year. He found that such return and records showed that the partnership had claimed deductions only for those amounts paid in 1968. For that reason, he determined that in the subsequent years, it had improperly deducted accrued but unpaid taxes, since the partnership had never requested or secured permission from the Commissioner to change its method of accounting. See sec. 446(e).

The petitioner has the burden of establishing that the Commissioner's determination was incorrect (Rule 142, Tax Court Rules of Practice and Procedure) and that 969 Maude was entitled to use the accrual method of accounting; yet, she never adduced any evidence regarding the accounting method followed in 1968, the critical year in deciding that question, nor did she offer any evidence to establish that 969 Maude obtained the Commissioner's permission to change its accounting method. The petitioner did not obtain the return from the accountant who prepared it, nor did she offer an excuse for her failure to do so. In light of the petitioner's failure of proof, we must sustain the Commissioner's determination on this issue.

*Decision will be entered under Rule 155.*