E. GERALD LACKEY and MARY JANE LACKEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lackey v. Commissioner
DOCKET NO. 835-74.
United States Tax Court
T.C. Memo 1977-213; 1977 Tax Ct. Memo LEXIS 229; 36 T.C.M. (CCH) 890; T.C.M. (RIA) 770213; July 12, 1977, Filed *229 Petitioner E. Gerald Lackey was the president of Corporation A, Corporation T and Corporation P, and a minority shareholder of the first two corporations. He made charitable contributions of the stock of Corporation A in both 1968 and 1969. The stock of Corporation A became worthless in 1970. Held, the fair market value of the stock contributions determined. Petitioners were indebted to a bank for over $300,000. In 1970 the bank foreclosed on the collateral securing petitioners' indebtedness. Held, all the property sold by the bank was owned either jointly or severally by petitioners. No portion of the proceeds from foreclosure is allocable to interest on indebtedness within the meaning of section 163(a). In 1970 the Internal Revenue Service seized and sold stock and antiques owned by petitioners to satisfy the latters' purported liability under section 6672. Subsequently, a portion of the proceeds of such sales was returned to petitioner Mary Jane Lackey. Held, the antiques were held by petitioners primarily for sale to customers in the ordinary course of business. Petitioners' basis in the antiques is determined, as is the amount of gain or loss from the respective sales *230 of stock and antiques. Petitioner E. Gerald Lackey traveled extensively in 1971. Held, no portion of the travel expenses incurred on such trips is deductible under section 162. Petitioner E. Gerald Lackey borrowed $100,000 from a bank and transferred the funds to Corporation A. Held, the transfer to Corporation A was a contribution to the capital of the corporation, not a loan. Held, further, petitioner may add the $100,000 to his basis in the stock of Corporation A. Petitioners were issued two notes by Corporation P in the face amounts of $75,000 each. Held, petitioners are not entitled to bad debt deductions for such notes because they failed to establish their respective bases in the notes. Ocie F. Murray, Jr., for the petitioners. Gary F. Walker, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1969, 1970 and 1971 as follows: Year
Deficiency
1969
$1,804.96
1970
9,656.08
1971
3,063.00
Several concessions have been made, leaving for our resolution: the fair market value of stock in American Truck Lines, Inc., at the time of its contribution to the Lackey Foundation *231 in 1968 and 1969; whether any portion of the proceeds from foreclosure of petitioners' property by Northwestern Bank is allocable to interest on petitioners' indebtedness to the bank; whether petitioners realized any loss on the seizure and sale of certain stock and antiques by the Internal Revenue Service; whether petitioners are entitled to deduct numerous travel expenses incurred by petitioner E. Gerald Lackey in 1971; whether a $100,000 advance to American Truck Lines, Inc., was a loan or a contribution to capital; and whether two $75,000 notes issued by Parrish Dray Lines, Inc., and Tarheel Financial Corporation were deductible by petitioners as business bad debt losses in the year 1970. GENERAL FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners E. Gerald Lackey and Mary Jane Lackey, husband and wife, resided in North Carolina at the time of filing the petition herein. Petitioners, using the cash basis method of accounting, filed joint income tax returns for the calendar years 1969, 1970 and 1971 with the Internal Revenue Service Center, Chamblee, *232 Ga. The designation "petitioner" will hereafter refer to E. Gerald Lackey only. Petitioner E. Gerald Lackey was the president and a minority shareholder of American Truck Lines, Inc. (hereafter sometimes referred to as ATL), from 1968 through 1971. Mrs. Lackey was the secretary of the corporation for a similar period of time. At all times relevant to this case Mr. Lackey was also the president of both Parrish Dray Lines, Inc., and Tarheel Financial Corporation and a minority shareholder of the latter corporation. Tarheel Financial Corporation owned all the stock of Parrish Dray Lines, Inc. American Truck Lines was principally engaged in the intrastate hauling of freight in North Carolina. In addition, the corporation leased trailers to other trucking concerns (including Parrish Dray Lines, Inc.) and moved household furniture throughout the country (as an agent of North American Van Lines). Parrish Dray Lines, Inc., was principally engaged in the interstate hauling of freight. ISSUE I - CHARITABLE CONTRIBUTIONS FINDINGS OF FACT On September 20, 1968, petitioner donated 5,000 shares of ATL stock to the Lackey Foundation, an organization described in section 170(c)(2) of the Internal Revenue Code of 1954. *233 [1] Just before the contribution petitioner owned about 82,500 shares of a total 434,200 shares of ATL stock then outstanding. Petitioner claimed a charitable contribution of $25,000 for the donation, but because the contribution exceeded the maximum limits allowable for 1968 a carryover deduction of $4,665 was taken in the year 1969 (the first year before the Court). Respondent disallowed the 1969 carryover deduction claiming the stock had no market value at the time of contribution. On November 4, 1969, petitioner made a second gift of 5,000 shares of ATL stock to the Lackey Foundation. While no deduction was claimed on his 1969 income tax return for this second transfer, petitioner now claims, by an amended petition, a charitable deduction in the amount of $25,000. The parties have stipulated to the following sales of ATL stock: Price
No. of Date
Sold To
Per Share
Shares
5-24-68
[2] *234 John L. Williams $5.00
100
9-2-68
A. Laban Chapman
1.00
6,500
9-20-68
R. Gaither Critz
1.00
1,000
10-20-68
Royall Brown
1.00
2,000
10-21-68
A. Laban Chapman
1.00
6,500
7-15-69
Fred B. Preston
4.00
57
5-24-68
[2]John L. Williams 5.00
100
12-24-68
W. G. Moser
5.00
100
12-12-68
Phillip A. Brooks
5.00
500
11-1-68
Madge T. Matthews
5.00
100
12-18-68
J. D. Shields
5.00
100
On brief the parties agreed to the following additional transfers of ATL stock: Price
No. of Date
Sold To
Per Share
Shares
6-16-69
E. Gerald Lackey $1
20,170
8-7-69
A. Laban Chapman
1
1,500
9-5-69
E. Gerald Lackey
1
150
1-6-70
A. Laban Chapman
1
700 Petitioner acquired ATL stock at various times over the period May 29, 1967, to September 5, 1969, by paying $1 per share to the corporation. The original subscribers of stock in ATL (approximately 25 individuals) were given the privilege of buying stock from the corporation (apparently exercisable at any time) for $1 per share, as legally allowed under North Carolina law. Further, certain employees of ATL were given the privilege of buying ATL stock from the corporation at $1 less than "what the going sale of the stock was at that time." Of the individuals listed above, A. Laban Chapman, *235 R. Gaither Critz and Royall Brown were original subscribers of ATL stock, and Fred B. Preston was an employee of the company. [3] The sales listed above do not purport to be all the sales of ATL stock. The stock of ATL became worthless during the year 1970. OPINION We must determine the fair market value of ATL stock at the time of the contributions to the Lackey Foundation in 1968 and 1969. Petitioner contends the stock was worth $5 per share at the time of each contribution. In the notice of deficiency respondent claimed that the stock had no value at the time of the 1968 contribution. However, respondent now claims that the stock had no value greater than $1 per share at the time of each contribution. Section 170(a) allows a deduction (subject to limitations which are not relevant here) for charitable contributions made during the taxable year. For contributions made in years before 1970, section 1.170-1(c)(1), Income Tax Regs., states: *236 If a contribution is made in property other than money the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * See also Kaplan v. Commissioner,43 T.C. 663 (1965). The fair market value of an item of property at the time of its contribution is a question of fact. Petitioner has the burden of proof to show that the ATL stock had a fair market value greater than the $1 per share conceded by respondent. Welch v. Helvering,290 U.S. 111 (1933). The only evidence that the fair market value of ATL stock was greater than $1 per share is the stipulated sales and the testimony of petitioner E. Gerald Lackey. Petitioner testified that the general public was buying ATL stock in November 1969 for $5 per share. Sales of stock, while probative evidence, are not conclusive as to fair market value. Robertson v. Routzahn,75 F. 2d 537 (6th Cir. 1935); Heiner v. Crosby,24 F. 2d 191 (3d Cir. 1928). See also *237 MacRae v. Commissioner,9 B.T.A. 428 (1927). This is particularly true where such sales are sporadic and represent relatively few shares. The stipulated sales of stock here indicate that in 1968 1,000 shares of stock were sold at $5 per share and 16,000 shares of stock were sold at $1 per share. [4] Sales at either price occurred before and after the valuation date for the first contribution: September 20, 1968. One sale of 1,000 shares at $1 per share occurred on that valuation date. While the sales at $5 per share were made to persons unrelated to the corporation, they were relatively small in number. [5] The sales to original subscribers (although subject to value restrictions) comprised the greater volume of shares sold and were made to persons who may well have had greater knowledge of the condition of the corporation than the outsiders. We are not convinced that the sales at $5 per share are indicative of the fair market value of the corporation's stock on the date of the contribution in 1968. However, we believe such evidence does tend to show that the stock had a fair market value in excess of the $1 per share value asserted by respondent. After considering all the evidence *238 presented, we believe that the fair market value of ATL stock on September 20, 1968, was $3 per share. The parties have only stipulated to one sale of stock in 1969 to someone other than an original subscriber and that was made to Fred B. Preston, an employee of the corporation, on July 15, 1969, for $4 per share. This one sale of 57 shares is insufficient to convince us that the fair market value of ATL stock was greater than the $1 per share value claimed by respondent. Petitioner's testimony that the stock had a $5 per share value on that date does not change our conclusion. Accordingly, we sustain the $1 per share value asserted by respondent for the ATL stock contributed to the Lackey Foundation in 1969. ISSUE 2 - INTEREST PAYMENT FROM FORECLOSURE PROCEEDS FINDINGS OF FACT Prior to November 20, 1970, petitioners had a total outstanding indebtedness to the Northwestern Bank in the amount of $300,500, plus interest.Such indebtedness *239 arose from six notes executed by petitioners between December 1968 and March 1970. [6] On November 20, 1970, the Northwestern Bank placed the collateral securing the six notes for sale. All of the property was ultimately sold and the proceeds credited against petitioners' indebtedness in the amount of $252,682.38. There was no agreement between Northwestern Bank and petitioners as to how payments on the loans should be applied to reduce their indebtedness. The bank applied the proceeds from foreclosure solely to principal since the collateral sold was insufficient to pay the full amount of the principal indebtedness. Although all of the collateral was put up for sale on November 20, 1970, there is no indication when all of the property was actually sold or credited to petitioners' account. *240 The parties have agreed, however, that at least $48,103.74 of sale proceeds were applied to reduce petitioners' indebtedness in 1970.In addition, at least $51,772.34 of petitioners' indebtedness was "written off" by the bank in 1970 as uncollectible. On their income tax return for 1970, petitioners claimed a $223,500 loss deduction under section 165(c)(2) for the collateral seized by the bank. They have since conceded that the deduction was improper. However, they claim a portion of the sale proceeds is allocable to interest on indebtedness within the meaning of section 163(a). If the Court finds that a portion of the proceeds is deductible as interest, the parties agree the exact amount of the deduction can be determined pursuant to Rule 155, Tax Court Rules of Practice and Procedure.
In the notice of deficiency respondent made the following determination with respect to the loss deduction disallowed: You claimed as a loss under Section 165(c)(2) of Internal Revenue Code the amount of $223,500.00 for tax year ended December 31, 1970. Your basis for this claim was that you were guarantor of Parrish Dray Lines, Inc.'s obligations to the Northwestern Bank, North Wilkesboro, North *241 Carolina and as guarantor you were required to put up as collateral various properties which were seized by the bank when Parrish Dray Lines, Inc. defaulted on its obligations. The $223,500.00 represents your basis in the property seized by this Bank. It has been determined that you were the maker of the loans with Northwestern Bank and that your property seized by the bank was not put up as collateral for Parrish Dray Lines, Inc. You are not entitled to a loss under Section 165(c)(2) or any other Section of the Internal Revenue Code. Accordingly, taxable income is increased by the amount of $223,500.00. On April 1, 1970, petitioner E. Gerald Lackey, claimed to have a net worth of $1,281,563.16. On December 18, 1970, petitioner filed a voluntary petition in bankruptcy and was subsequently adjudicated a bankrupt. The bankruptcy petition lists liabilities of over two million dollars and assets of less than one-quarter million dollars. ULTIMATE FINDING OF FACT All the collateral sold by the bank was owned by petitioners either separately or jointly. OPINION The issue we have to decide is whether any portion of the proceeds from the foreclosure of petitioners' collateral by Northwestern *242 Bank is allocable to interest accrued on petitioners' indebtedness to the bank. Petitioners contend that under North Carolina law the proceeds from foreclosure must be applied first to interest, to the extent thereof, and thereafter to principal. Respondent disagrees and argues that under the circumstances of this case the proceeds of sale first reduce the principal indebtedness with any excess applied against interest. Respondent also contends that petitioners have not shown that the property securing the debt was owned by them at the time of foreclosure, and, therefore, they have not shown they paid any of the indebtedness (principal or interest). This latter allegation was made by respondent on brief following trial. For this reason, we think it would be appropriate not to consider the issue now. Schwager v. Commissioner,64 T.C. 781, 788 (1975); Horvath v. Commissioner,59 T.C. 551 (1973). [7] This is particularly true where, as here, petitioners would be surprised and substantially disadvantaged by the delay in raising the issue. Horvath v. Commissioner,supra.However, petitioners have not objected to having the issue raised and instead seem to rely on the evidence in the *243 record as supporting a finding that they owned all the property seized. In the notice of deficiency respondent refers to the property seized by the bank as "your property seized by the bank." While respondent says petitioners' property was not put up as collateral for Parrish Dray Lines, Inc., see footnote 6, supra, the notice of deficiency does not say nor suggest that petitioners' property was not put up as collateral for their own loan. In fact, we believe the use of the words "your basis in the property seized by this Bank" and "your property seized by the bank" implies (to say the least) that petitioners did own all the property seized by the bank. The position taken by respondent requires the presentation of different evidence and is a new issue upon which respondent has the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure; Sanderling, Inc. v. Commissioner,66 T.C. 743, 757-758 (1976). Cf., Estate of Emerson v. Commissioner,67 T.C. 612, 620 (1977).
There is no evidence in the record which even suggests that petitioners did not own the securities seized and sold by the Northwestern *244 Bank. Moreover, Mr. Lackey presented a financial statement to respondent's agents during audit dated April 1, 1970, listing all the securities pledged as collateral for these loans. Based on all the evidence presented, we believe that petitioners owned, either jointly or separately, all the property seized and sold by the bank. Petitioners have not claimed that any loss arose under section 1001 from the sale of the pledged securities, nor has respondent claimed any gain resulted therefrom. [8] The only deduction sought by petitioners with respect to the foreclosure sales by the bank is a deduction for interest accured on the outstanding principal indebtedness. The general rule in this area is that voluntary partial payments made by a debtor to a creditor are, in the absence of any agreement between the parties, to be applied first to interest and then to principal. Story v. Livingston,38 U.S. 310 (1839). Helvering v. Drier,79 F. 2d 501, 503 (4th Cir. 1935), affg. a Memorandum Opinion of this Court. This is the rule in North Carolina. Bunn v. Moore's Executors,2 N.C. 279 (1796). However, *245 an exception to the general rule exists in the case of an involuntary foreclosure of mortgaged property where the evidence "strongly indicates" that the mortgagor is insolvent at the time of foreclosure. Newhouse v. Commissioner,59 T.C. 783, 789 (1973). In Newhouse we said: it [is] difficult to believe that a creditor who has foreclosed on the collateral of an insolvent debtor, and who will never get back the full amount of his principal, is required to report a fictitious amount of income designated as "interest." [Fn. ref. omitted.] [59 T.C. 790.]
Rejecting the interest first rule, we held that no portion of the proceeds from the foreclosure sale therein was allocable to interest. We have previously rejected the interest first rule in cases where the creditor's tax picture was before us and there were either foreclosure sales or transfers in lieu of foreclosure. In these cases we determined that a creditor does not receive any interest income from a transfer to him in lieu of foreclosure if the fair market value of the transferred property does not exceed the outstanding principal indebtedness at the time of the transfer. Manufacturers Life Insurance Co. v. Commissioner,43 B.T.A. 867, 873-874 (1941); *246 Manhattan Mutual Life Insurance Co. v. Commissioner,37 B.T.A. 1041, 1043-1044 (1938). See also Helvering v. Missouri State Life Ins. Co.,78 F. 2d 778 (8th Cir. 1934). In Estate of Bowen v. Commissioner,2 T.C. 1 (1943), we applied the proceeds from a foreclosure sale to interest first and then to principal where the debtor was not shown to be insolvent and the payments, in spite of foreclosure, were said to be voluntary. [9]
The line drawn by our decisions centers on the insolvency of the debtor. That is, if there is a "strong indication" that the debtor is insolvent at the time of foreclosure or transfer in lieu of foreclosure, then the proceeds from foreclosure or the value of the property transferred will be applied first to principal and then to interest. On the other hand, if the debtor is solvent, the proceeds from foreclosure will be applied first to interest and then to principal. Petitioners rely heavily on our opinion in Granger v. Commissioner,T.C. Memo. 1970-155.[10] In Granger we applied the proceeds from foreclosure to interest first and allowed the taxpayers an appropriate interest deduction. We stated that the *247 general rule in North Carolina was to apply partial payments upon a debt to interest first and then to principal, and that nothing in the record suggested an agreement existed between the debtor and creditor which would alter that rule. There was, however, no indication in Granger that the debtor was insolvent at the time of foreclosure. Further, the Commissioner did not argue in that case that the proceeds from foreclosure should be applied to principal first. Rather, he simply argued that the taxpayers failed to show how the proceeds from foreclosure were actually applied and, consequently, did not show they made any interest payments. We rejected the latter argument by applying the "interest-first" rule. In the present case there is a strong indication from the record that petitioner E. Gerald Lackey was insolvent at the time of foreclosure. Certainly, there was little likelihood that Northwestern Bank would receive any payments from petitioners other than the proceeds from the foreclosure sales.Indeed, the bank "wrote-off" $51,772.34 of petitioners' indebtedness *248 as uncollectible in 1970. While it is true that Mrs. Lackey also signed two of the notes in question, there is no evidence in the record regarding her financial health.Since it is the petitioners' burden to show they are entitled to an interest deduction, the absence of evidence here militates against them. Respondent entered a financial statement into evidence made by Mr. Lackey showing the latter's net worth, as of April 1, 1970, at $1,281,563.16. [11] The liabilities on that statement totaled $323,509.84. However, Mr. Lackey filed for bankruptcy on December 18, 1970. The petition in bankruptcy indicates that Mr. Lackey's liabilities at that time were over two million dollars and far exceeded his assets of less than one-quarter million dollars. Petitioners make much of the fact that there is no evidence in the record as to what transpired between November 20, 1970 (the date of foreclosure), and December 18, 1970 (the date of the petition in bankruptcy), and that respondent has, therefore, not shown that they were insolvent on the earlier date. However, petitioners again fail to realize that their failure to produce evidence militates against them. [12] The petition in bankruptcy *249 lists liabilities incurred in years before 1970 which were not included in the financial statement of April 1, 1970. We are inclined to believe that the April 1, 1970, financial statement is simply incomplete. In fact, there are words to that effect in the statement itself. We believe Mr. Lackey was insolvent at the time of foreclosure in November 1970, and according to our decision in Newhouse,supra, the proceeds from foreclosure will be applied to principal first and then to interest. Since the proceeds did not exceed the amount of the principal indebtedness, no deduction for interest can be allowed. Petitioners have not presented, nor have we been able to find, any North Carolina law which would suggest an opposite result. The cases they cite follow the general "interest-first" *250 rule, but there are no cases indicating that that rule is applicable to a foreclosure sale of property belonging to an insolvent debtor.We believe the "interest-first" rule is inapplicable here.
ISSUE 3 - LOSS ON PROPERTY SEIZED BY THE INTERNAL REVENUE SERVICE FINDINGS OF FACT In 1970 the Internal Revenue Service (hereafter referred to as the IRS) seized and sold property belonging to petitioners to satisfy their purported liability under section 6672. [13] *251 The IRS had asserted a claim against American Truck Lines, Inc., for unpaid WT-FICA ("withholding") taxes and took action against petitioners to collect the 100 percent penalty provided for in the section noted. The property seized and sold by the IRS can be divided into two groups: stock and antiques. The stock, which represented some nine corporations, was owned by petitioners and sold by the IRS on or about October 27, 1970. The antiques, which consisted of various items including clocks, glassware, and furniture, were also owned by petitioners and held for sale by them as inventory in a business operated under the name "Log Cabin Antique Shop." The petitioners each had a one-half interest in the antiques at the time they were sold.
In January 1974 the IRS returned one-half of the proceeds of sale of the antiques (less expenses of sale) to Mrs. Lackey under a consent judgment. The IRS also returned the proceeds from the sale of stock owned by Mrs. Lackey. On their income tax return for 1970 petitioners deducted $38,415 as a loss under section 165(c)(2) for the property seized and sold by the IRS. The deduction was said to represent their total basis in all the property seized. [14] *252 Respondent disallowed the deduction in its entirety claiming the seizure of petitioners' property was not deductible under any provision of the Internal Revenue Code of 1954. In an amended answer, respondent asserts that even if petitioners are entitled to a loss deduction with respect to the property seized, their basis in the assets was not $38,415. Respondent admits that petitioners correctly reported their basis in the stock seized by the Government at $17,209. However, he contends that petitioners' basis in the antiques was no greater than $6,500. In discussions with the Internal Revenue Service, Mr. Lackey indicated his basis in the antiques was $6,000 on April 1, 1970. Moreover, petitioners' income tax return for 1969 lists a closing inventory in the Log Cabin Antique Shop of $6,500; and their 1970 income tax return indicates that no additional sales or purchases of antiques were made. The amount realized from the sale of antiques (less expenses of sale) was $6,484.35. OPINION The disputes we have to resolve concern petitioners' basis in the antiques seized and sold by the IRS to satisfy their purported liability under section 6672, and the proper amount of *253 any deductible losses attributable to the Government's seizure of both the stock and antiques. [15]
The parties agree that the loss, if any, resulting from the seizure of stock is a capital loss. Petitioners claim that the loss from the seizure of stock is $17,209, representing their basis in the stock. Respondent contests this computation of the loss, and asserts that the loss is the difference between petitioners' basis in the stock and the proceeds realized from its sale. However, respondent argues that petitioners have not shown the total amount realized on the sale of stock.Rather, he claims the record indicates only that stock with a basis of $7,100 was sold for $2,758.57. Because petitioners have failed to show the amount realized on the remaining stock (with a basis of $10,109), respondent argues petitioners are only entitled to a capital loss of $4,341.43 with respect *254 to the seizure of stock. Petitioners claim that their basis in the antiques was $21,206 and that the amount realized from their sale was $6,484.35. Accordingly, petitioners claim a loss deduction of $14,721.65. They claim such loss is ordinary, not capital, because the antiques were property held by them primarily for sale to customers in the ordinary course of business. Respondent contends that petitioners had a basis in the antiques no greater than $6,000, [16] and, therefore, no loss resulted from their seizure. Using respondent's figures, there is a gain from the seizure of antiques of $484.35 which respondent says he has not sought to include in petitioners' income. However, in his reply brief respondent uses the $484.35 figure to reduce the amount of capital loss realized from the sale of stock, thereby leaving petitioners a deductible capital loss of $3,857.08. We have previously determined by court order that the dispute over the basis in the antiques is a new issue upon which respondent has the burden of proof. *255 Rule 142(a), Tax Court Rules of Practice and Procedure.
While the evidence is not overwhelming on this point, we believe respondent has sustained his burden to show that petitioners' basis in the antiques was no greater than $6,500. Mr. Lackey represented the basis of the antiques to be $6,000 in his April 1, 1970, financial statement. While he now claims this figure represented only his basis in the antiques and not his wife's, he made representations to the IRS agent on audit that the antiques referred to in the financial statement were owned by both of them. Further, petitioners' 1969 income tax return shows a closing inventory in the antique business of $6,500, and their return for 1970 indicates that no additional sales or purchases of antiques occurred in 1970. After viewing all the evidence presented, we believe petitioners' basis in the antiques seized and sold by the Government was $6,500. Petitioners argue that they realized nothing from the disposition of stock seized and sold by the Government and, consequently, they are entitled to deduct the full amount of their basis in the stock as capital loss. This argument simply does not comport with basic principles of taxation. *256 The stock was sold under the direction of the Government and the proceeds of sale were either applied to reduce petitioners' tax liability or returned to them. In either case, petitioners realized an economic benefit from the foreced sale of stock equal to the proceeds of sale. Therefore, petitioners' gain or loss must be computed under section 1001 using the proceeds of sale as the amount realized. Petitioners acknowledge that this is the proper method for computing any loss from the seizure of antiques. The stock is no different, except that the stock is a capital asset, and gain or loss from the sale thereof must be characterized accordingly. [17] *257 Commissioner v. Peterman,118 F. 2d 973 (9th Cir. 1941). Cf. Russo v. Commissioner,68 T.C. 135, 151-153 (1977). ISSUE 4 - TRAVEL EXPENSES FINDINGS OF FACT In 1971 petitioner E. Gerald Lackey was president of both Lackey Industries, Inc., and Parrish Dray Lines, Inc. During that year petitioner traveled extensively incurring expenses totaling $9,360 for meals, lodging and other related costs. Most of the above travel expenses were incurred while traveling between Winston-Salem (petitioner's residence) and Wilmington, N.C. Lackey Industries, Inc., had opened a warehouse and distribution center in Leland, N.C., a suburb of Wilmington, during 1971 and had offices in both Winston-Salem and Wilmington. In addition, the corporation was threatened with bankruptcy and petitioner traveled extensively throughout the year to a number of different states in an attempt to increase the warehouse business. Petitioner also made numerous trips in 1971 for the benefit of Parrish Dray Lines, Inc. Parrish had ceased business operations on March 27, 1970, and a receiver was appointed to conduct its business on November 3, 1970. During 1971 Mr. Lackey spent approximately 240 days in Wilmington, *258 N.C., and about 100 days in Winston-Salem. He made some 36 visits to Winston-Salem (his residence) staying usually only two or three days (mostly on weekends), but on occasion for as long as a week. Petitioner traveled to Sumter, S.C., Fort Lauderdale, Fla., Spartanburg, S.C., Greenville, S.C., Atlanta, Ga., Charleston, S.C., Charlotte, N.C., and Wilmington, Del., during 1971 for the purpose of conducting business for either Lackey Industries, Inc., or Parrish Dray Lines, Inc. All of these trips were "overnight" in the sense that they required sleep or rest, and the total time spent on such trips was approximately 14 days. On June 4, 1971, petitioner drove from Wilmington, N.C., to Charlotte, N.C., and then to Winston-Salem all in one day. While in Charlotte petitioner conducted business on behalf of Parrish Dray Lines, Inc. On November 17, 1971, petitioner drove from Wilmington, N.C., to Charleston, S.C., primarily for business reasons and returned to Wilmington that same day. Neither of these trips was overnight in the sense that the exigencies of business required petitioner to sleep or rest. On their income tax return for 1971, petitioners deducted $9,360 for the cost of *259 meals and lodging while away from home. Respondent disallowed this deduction in its entirety claiming that petitioners did not show the expenses were "ordinary and necessary" nor that they were expended for the purposes designated. Respondent concedes, however, that the expenses were incurred for travel. Petitioner has not been reimbursed for any of the $9,360 expended. OPINION The issues we have to decide are whether the travel expenses incurred by petitioner in 1971 were ordinary and necessary business expenses within the meaning of section 162(a), and if so, whether such expenses have been adequately substantiated. Petitioners claim that all of the expenses were incurred in carrying on the business of Lackey Industries, Inc. However, in contrast to the way the expenses were reported on their tax return, petitioners claim on brief that the great majority of these expenses were incurred while petitioner E. Gerald Lackey was not away from home overnight. They contend that these expenses were ordinary and necessary business expenses under section 162(a) and that the substantiation requirements of section 162 have been met. Petitioners claim the remaining travel expenses were incurred *260 while away from home overnight, and that as to these expenses the substantiation requirements of section 274(d) have been met. Petitioners have not, however, suggested what portion of the $9,360 was incurred while away from home and what portion was not. Finally, petitioners claim that Mr. Lackey's principal place of business in 1971 was Winston-Salem, N.C. Respondent contends that petitioners have not met the substantiation requirements of section 274(d) with respect to the $9,360 of travel expenses. He contends there is insufficient substantiation of either the business purpose of the trips or of the amounts spent on each trip. [18] Respondent also disputes petitioners' contention that any portion of the travel expenses is deductible as a local business transportation cost. While petitioners have claimed in several instances that all Mr. Lackey's travel expenses were incurred in connection with his business of being an employee of *261 Lackey Industries, Inc., on brief they seem to accept the fact that a portion of the travel expenses were incurred on behalf of Parrish Dray Lines, Inc. Perhaps these are alternative factual assertions. In any event, we have found as a fact that a portion of the expenses were indeed incurred for the benefit of Parrish Dray Lines, Inc., although we cannot determine from the evidence the dollar amount of that portion. [19]
Section 162(a) of the Internal Revenue Code of 1954 states: There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * *
(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * * Substantiation of travel expenses is required by section 274(d) which states: No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), * * *
unless the taxpayer substantiates *262 by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense * * * (C) the business purpose of the expense * * *.
Petitioners claim that most of the disallowed travel expenses were incurred with respect to travel which was not "away from home" within the meaning of section 162(a)(2). This argument is apparently offered as an attempt to avoid the substantiation requirements of section 274. See section 1.274-5(a) Income Tax Regs.
We will first determine whether any of the expenses are deductible as travel expenses while away from home in the pursuit of business under section 162(a)(2). In construing the predecessor of section 162(a)(2), the Supreme Court noted in Commissioner v. Flowers,326 U.S. 465, 470 (1946), that: Three conditions must thus be satisfied before a traveling expense deduction may be made under * * * [section 162(a)(2)]: (1) The expense must be a reasonable and necessary traveling expense, as that term is generally understood. This includes such items as transportation fares and food and lodging expenses incurred while traveling. (2) The expense must be incurred "while away from home." (3) The expense must be incurred *263 in pursuit of business. This means that there must be a direct connection between the expenditure and the carrying on of the trade or business of the taxpayer or of his employer. Moreover, such an expenditure must be necessary or appropriate to the development and pursuit of the business or trade. Whether particular expenditures fulfill these three conditions so as to entitle a taxpayer to a deduction is purely a question of fact in most instances. * * * The parties here apparently only disagree over the second and third conditions set forth in Flowers (although, we must admit, they really do not seem to agree on what it is they disagree about). The Supreme Court has avoided establishing a definitive standard for determining the "tax home" of nonmilitary taxpayers under section 162(a)(2). [20] However, we have long held that the taxpayer's "home" for purposes of this statute is his principal place of business or employment. Bochner v. Commissioner,67 T.C. 824, 827 (1977); Coombs v. Commissioner,67 T.C. 426, 478 (1976), on appeal (9th Cir., Feb. 14, 1977); Foote v. Commissioner,67 T.C. 1, 4 (1976); Blatnick v. Commissioner,56 T.C. 1344, 1348 (1971); Michaels v. Commissioner,53 T.C. 269, 273 (1969); *264 Owens v. Commissioner,50 T.C. 577, 580 (1968); Kroll v. Commissioner,49 T.C. 557, 561 (1968); Garlock v. Commissioner,34 T.C. 611, 614 (1960). Petitioner spent approximately 240 days in Wilmington, N.C., and about 100 days in Winston-Salem. He testified that most of the time spent in Winston-Salem was on weekends. Although he also testified that the home office of Lackey Industries, Inc., was in Winston-Salem and that he was attached to that home office, we cannot conclude from such generalized statements that business was actually conducted by petitioner in Winston-Salem. Certainly, if business was conducted in Winston-Salem, petitioner has failed to provide us with any particulars. We believe, therefore, that Wilmington, N.C., was petitioner's principal place of business in 1971. [21]
Since *265 Wilmington was petitioner's "tax home" for purposes of section 162(a)(2), the expenses for meals and lodging while in Wilmington are not deductible. Foote v. Commissioner,supra. Petitioner did travel between Wilmington and Winston-Salem numerous times, staying overnight in each place.Accordingly, he was "away from home" within the meaning of section 162(a)(2) during his visits to Winston-Salem. However, he has failed to meet the third requirement of Flowers,supra, that the travel expenses must be incurred in the pursuit of business. See Barnhill v. Commissioner,148 F. 2d 913 (4th Cir. 1945). Petitioners' family residence was in Winston-Salem, and we are inclined to believe that all the trips thereto were made primarily for personal reasons. Certainly, petitioners have failed to carry their burden to show otherwise. Welch v. Helvering,290 U.S. 111 (1933). Accordingly, the expenses incurred on these trips are nondeductible personal expenses under section 262. See section 1.162-2(b)(1) and (2), Income Tax Regs.; Mazzotta v. Commissioner,57 T.C. 427, 429 (1971), affd. per curiam 465 F. 2d 1399 (2d Cir. 1972). [22] Cf. Montgomery v. Commissioner,64 T.C. 175, 180 (1975), affd. *266 532 F. 2d 1088 (6th Cir. 1976). As we noted in our findings of fact, petitioner did travel to Sumter, S.C., Fort Lauderdale, Fla., Spartanburg, S.C., Greenville, S.C., Atlanta, Ga., Charleston, S.C., Charlotte, N.C., and Wilmington, Del., during 1971 primarily to conduct business for either Lackey Industries, Inc., or Parrish Dray Lines, Inc. While the expenses on these trips were incurred while petitioner was "away from home" and might, in the absence of section 274, be deductible under section 162(a)(2) or section 212, there is no evidence at all indicating what portion of the total $9,360 of travel expenses is allocable to these trips. The substantiation requirements of section 274(d) prohibit us from making a Cohan[23] type of approximation. Section 1.274-5(a), Income Tax Regs.; cf. LaForge v. Commissioner,434 F. 2d 370 (2d Cir. 1970), revg. in part 53 T.C. 41 (1969). Therefore, no deduction for the expenses incurred in these trips can be allowed. [24] *267 Petitioner made one-day trips to Charlotte, N.C., and Charleston, S.C., on June 4 and November 17, 1971, respectively. Neither of these trips was "overnight" in the sense that the exigencies of business required petitioner to sleep or rest before returning home, United States v. Correll,389 U.S. 299 (1967), and consequently, no deduction can be allowed under section 162(a)(2). However, it is arguable that the costs of transportation alone on these trips are deductible under section 162(a) or section 212. We have already determined that the trips from Wilmington to Winston-Salem were primarily personal in nature and the costs attributable thereto were nondeductible. While we think the additional cost of stopping and conducting business in Charlotte on June 4, 1971, could be deducted under section 162(a), or perhaps section 212, there is no way we can estimate that *268 additional cost from the record before us. Similarly, although the trip to Charleston, S.C., on November 17, 1971, was made primarily for business reasons, the record does not give us any basis to make an estimate of the transportation costs incurred on that trip. Green v. Commissioner,59 T.C. 456, 460 (1972). Accordingly, no deduction is allowed for these one-day trips. Our conclusion is that the disallowance of the entire $9,360 of travel expenses is sustained for the various reasons set out above. ISSUE 5 - MR. LACKEY'S TRANSFER OF $100,000 TO ATL FINDINGS OF FACT Petitioner E. Gerald Lackey borrowed $100,000 from the Northwestern Bank. Soon thereafter, on January 9, 1969, petitioner transferred this $100,000 to American Truck Lines, Inc. The cash receipts and disbursements journal of ATL reflects the receipt of $100,000 from petitioner, and the corporation's ledger account entitled "Accounts Payable - Officers, Stockholders and Employees" reflects an entry of $100,000 for January 1969. The transfer of $100,000 to ATL was made by petitioner to assist ATL in purchasing 75,000 shares of stock in Tarheel Financial Corporation, a North Carolina corporation which owned all the *269 stock of Parrish Dray Lines, Inc. No note or other written agreement was executed by petitioner or ATL to establish the existence of a loan, nor were any payments of principal or interest ever made. ATL ceased business operations in February 1970. An involuntary petition in bankruptcy was filed in April of that year and the corporation was subsequently adjudicated a bankrupt. Petitioner never attempted to collect on the purported loan to ATL, nor did he file a claim in the corporation's bankruptcy proceedings for the $100,000 transferred. The stock of ATL became worthless in 1970.At that time petitioners owned 68,000 shares of stock which cost them $1 per share to acquire. Petitioners were at all times minority shareholders of ATL. Petitioners did not claim an income tax deduction for the $100,000 advance on any of their tax returns for the years in question. By an amended petition, petitioners claim they are entitled to either a business or nonbusiness bad debt deduction. On brief petitioners claim that if no debt existed, the $100,000 advance should be added to their basis in the ATL stock which became worthless in 1970. OPINION The issue raised here is whether the transfer *270 of $100,000 by petitioner to ATL represented a loan to ATL or a contribution to capital. Petitioners contend that the transfer constituted a bona fide loan which became worthless in 1970 entitling them to a business bad debt deduction in that year. In the alternative, petitioners claim that if the transfer was a contribution to capital, it should be added to their basis in the ATL stock which became worthless in 1970. Respondent claims that no bona fide debt was created by the transfer in question, and therefore, no bad debt deduction can be allowed. Respondent also claims that the advance should not be added to petitioners' basis in their ATL stock since the amount did not represent an "out of pocket" expenditure by Mr. Lackey. The dispute before us is one of fact. Piedmont Minerals Co. v. United States,429 F. 2d 560 (4th Cir. 1970). The burden of proof is on petitioners to establish that the $100,000 advance by Mr. Lackey was in fact a loan. National Farmers Union Service Corp. v. United States,400 F. 2d 483 (10th Cir. 1968). [25] A valid debt may exist between related parties without the existence of a note. Byerlite Corp. v. Williams,286 F. 2d 285 (6th Cir. 1960); Litton Business Systems v. Commissioner,61 T.C. 367, 377 (1973); *271 Malone & Hyde v. Commissioner,49 T.C. 575 (1968). There are no precise guidelines for making the determination whether an advance to a corporation represents debt or equity. John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946); Georgia-Pacific Corp. v. Commissioner,63 T.C. 790 (1975). Most of the decisions in this area list numerous factors identifying characteristic differences between debt and equity for tax purposes. Because an appeal from our decision would lie with the Court of Appeals for the Fourth Circuit, we will follow the opinions of that court in analyzing the present controversy. In Road Materials v. Commissioner,407 F. 2d 1121, 1125 (4th Cir. 1969), the court listed several factors it considered important in resolving this factual dispute: Lack of principal and interest payments, the absence of a maturity date, the doubtful prospects of repayment, the debt-equity ratio, and the unlikelihood of obtaining similar unsecured loans from disinterested investors are pertinent criteria. * * * [Fn. ref. omitted.] This list was not intended to be exclusive. The court also noted that bookkeeping entries were not *272 determinative and that the substance of the transaction determined the tax consequences, not the form. We are not required to accept the taxpayer's testimony that the parties intended to create a debtor-creditor relationship. Instead, we must determine from all the surrounding facts and circumstances that an unconditional obligation to repay the advances existed notwithstanding the lack of success of the venture. Road Materials v. Commissioner,supra at 1124; Wachovia Bank & Trust Co. v. United States,288 F. 2d 750 (4th Cir. 1961). In the present case no notes were executed to evidence the indebtedness petitioners claim arose from Mr. Lackey's $100,000 advance to ATL. While entries were made on the books of ATL indicating an indebtedness to petitioner of $100,000, we are not persuaded that these entries reflected the true nature of the transfer. No payments were ever made by ATL on the claimed indebtedness, nor is there any indication that Mr. Lackey sought to enforce his claim against ATL at any time. Additionally, no interest was ever accrued on the corporation's books. In petitioner's favor is the fact that the advance was apparently not made pro rata with advances from *273 other shareholders and did not increase petitioner's ownership interest in the corporation. McBride v. Commissioner,23 T.C. 926, 932 (1955). However, a contribution to capital need not be made pro rata with contributions from other shareholders. Perlman v. Commissioner,252 F. 2d 890 (2d Cir. 1958), affg. 27 T.C. 755 (1957). [26]
There is no indication whether the purported indebtedness here was subordinated to the rights of the corporation's other creditors. Piedmont Minerals Co. v. United States,supra at 563. However, we note that petitioner did not file a creditor's claim in the bankruptcy of ATL with respect to the alleged indebtedness. We think the ultimate issue is a close one, and it is not without doubt that we resolve it in favor of respondent. We are simply not convinced by the evidence presented that the advance to ATL in January 1969 represented bona fide indebtedness. Since the $100,000 advance represented an equity investment in ATL, petitioner's basis in his ATL stock must be increased by a like amount. The parties agree that the ATL stock became worthless in 1970, and since petitioner acquired all his stock prior *274 to 1970, his loss under section 165(g) will be a long-term capital loss. Respondent contends, however, that although the $100,000 advance is a contribution to capital, petitioner may not increase his basis in his ATL stock by this amount because the advance does not represent an "out of pocket" expenditure. This argument we find a bit confusing. There is no question that petitioner borrowed money from the bank and then transferred $100,000 to ATL in January 1969. We do not understand respondent to argue that the loan from the bank to petitioner was a sham or part of a step-transaction, nor do we think these arguments would be persuasive. Rather, respondent seems to argue that either petitioner never intended to repay the loan or that no actual payments to the bank were ever made because of petitioner's subsequent individual bankruptcy. The argument that petitioner never intended to repay his indebtedness to the bank in view of his "pending bankruptcy" is pure speculation and of questionable materiality. The argument that petitioner never actually repaid his indebtedness is refuted, at least in part, by the evidence and rejected completely as immaterial. We think the situation *275 here does not differ materially from those cases where money is borrowed to purchase stock, [27] or pay deductible expenses. [28] In such cases the loan is considered a separate transaction, and any loss or expense which is paid out of the borrowed funds (and is otherwise deductible) is deductible when so paid.Repayment of the principal amount of the borrowed funds is an event having no tax consequences. [29]
In the present case the loan from the bank to petitioner is a separate transaction from the subsequent contribution to capital of ATL. This is not to say *276 that the loan was not made to Mr. Lackey for the principal purpose of providing him with capital to invest in his corporation. Indeed, this may well have been the principal purpose of the loan. But petitioner is nonetheless entitled to an increase in the basis of his ATL stock for the amount of cash contributed to the corporation. Respondent relies in part on Antuna v. Commissioner,T.C. Memo. 1970-290, in which a bad debt loss deduction was denied for an unpaid account receivable because of the taxpayer's failure to establish that the debt was ever taken into income. Consequently, no basis in the debt was established. The Antuna case differs a great deal from the present one. We are not talking about petitioner's basis in previously untaxed income. Rather, we must determine petitioner's basis in his ATL stock. And such basis is properly increased by the amount of cash contributed to the corporation. Simply because petitioner acquired the cash he advanced to the corporation by borrowing from a bank does not change this result. Cf. Crane v. Commissioner,331 U.S. 1 (1947).
We think that respondent is asking, in effect, that we treat the two transfers as one: a direct loan from *277 the bank to the corporation. This we will not do. The bona fides of both transfers are evident. Sound business reasons existed for the bank making a loan to the shareholder, rather than the corporation. We will not disturb this business judgment.Accordingly, petitioner may add $100,000 to his basis in the ATL stock to account for his cash advance to the corporation. ISSUE 6 - NOTES ISSUED BY PARRISH DRAY LINES FINDINGS OF FACT On January 28, 1969, petitioner E. Gerald Lackey signed a document purporting to obligate Parrish Dray Lines, Inc., and Tarheel Financial Corporation for the amount of $75,000 to petitioner Mary Jane Lackey. On that same date Mr. Lackey executed a document purporting to obligate Parrish Dray Lines, Inc., for an amount of $75,000 to himself. [30] *278 Mr. Lackey was the president of both Parrish Dray Lines, Inc., and Tarheel Financial Corporation at all times relevant to these transactions and was a minority shareholder of Tarheel Financial Corporation. Tarheel Financial Corporation owned all the stock of Parrish Dray Lines, Inc. Parrish Dray Lines, Inc., ceased business operations on March 27, 1970. On November 3, 1970, a receiver was appointed for the corporation by the United States District Court for the District of South Carolina, Columbia Division. On December 31, 1970, the entire amount of each note remained unpaid. The note issued to Mr. Lackey individually and signed by Mr. Lackey as president of Parrish Dray Lines, Inc., does not indicate the consideration given for the note. It merely recites that "FOR VALUE RECEIVED" the corporation agrees to pay Mr. Lackey $75,000 on demand with interest to accrue at eight percent per annum. On the other hand, the $75,000 note issued to Mary Jane Lackey contains the following recital of consideration: For consideration of Jane L. Lackey [31] as guarantor of certain notes to Fruehauf Trailer Corporation for the purpose of Tarheel Financial Corporation to purchase the outstanding stock of Parrish Dray [Lines], Inc., and to supply a working capital for the operation of Parrish Dray [Lines], Inc., the said Jane Lackey has endorsed the notes and made assignments on entirety property. The *279 following note is executed as an obligation to Jane L. Lackey. Mrs. Lackey's note is almost identical to the note issued to Mr. Lackey, except that the former is signed by Mr. Lackey on behalf of both Parrish Dray Lines, Inc., and Tarheel Financial Corporation. No deductions were taken by petitioners with respect to either of the two notes during the years before us. By an amended petition petitioners claim they are entitled to either business or nonbusiness bad debt deductions in 1970 for these notes. OPINION The issue before us is whether petitioners are entitled to bad debt loss deductions in 1970 for either of the $75,000 notes issued to them by Parrish Dray Lines, Inc., and Tarheel Financial Corporation. Petitioners argue that each of them loaned $75,000 to Parrish Dray Lines, Inc., and that the notes evidenced this indebtedness.They contend that the loans were made in connection with Mr. Lackey's activities as an employee of the corporation, and consequently, are business debts which *280 became worthless in 1970. Alternatively, they claim non-business bad debt loss deductions. Respondent argues that petitioners have not shown their respective bases in the debts they claim became worthless in 1970. That is, the petitioners have not proven the notes were evidence of loans made to Parrish Dray Lines, Inc. Further, respondent asserts that at the end of 1970 there was every likelihood that the petitioners would receive substantial amounts from the receivership of Parrish Dray Lines, Inc., in satisfaction of these notes, and, therefore, they did not become worthless, either in whole or in part, in 1970. Section 166(a) allows a deduction for debts which become wholly or partially worthless during the taxable year. The amount of such deduction is limited by section 166(b) to the adjusted basis as provided in section 1011. As we stated in Swenson v. Commissioner,43 T.C. 897, 898 (1965): It is well established that the deduction of a bad debt from gross income under the income tax provisions of the internal revenue statutes is limited to debts created by advances out of capital or out of income previously taxed or exempted or, in other words, debts with regard to which *281 the taxpayer has a basis. * * * Petitioners' contention that the notes in question were issued as evidence of loans made to Parrish Dray Lines, Inc., is simply not supported by the evidence. The note to Mrs. Lackey indicates that it was given, at least in part, in exchange for her endorsement or guaranty of the obligations of Tarheel Financial Corporation. This guaranty does not represent an advance out of the capital of Mrs. Lackey and will not give her a basis in the note from Parrish Dray Lines, Inc., until such time (and to the extent) she is called upon for payments on her guaranty. See Eckert v. Burnet,283 U.S. 140 (1931); Perry v. Commissioner,49 T.C. 508, 521 (1968). [32] Although the note indicates that "assignments on entirety property" were also made by Mrs. Lackey, we have no idea of the value of such property, nor whether the assignments were actual transfers of property or merely assignments to secure her contingent liability as a guarantor. See Helvering v. Price,309 U.S. 409, 413-414 (1940). In any event, the evidence presented does not persuade us that the note represented a loan from Mrs. Lackey, and consequently, we are unable to determine her basis in the *282 note. Accordingly, no deduction under section 166 is allowed. A deduction for any loss on the note to Mr. Lackey must be denied for similar reasons. We are unable to determine, from the evidence presented, his basis in the note. The note itself does not indicate the consideration given, and the other evidence presented does not convince us that the note was issued in exchange for a cash advance or other loan as petitioners argue. [33]
Because petitioners have not carried their burden to prove their respective bases in the notes of Parrish Dray Lines, Inc., it is unnecessary for us to consider whether the notes represented business or nonbusiness debts, or whether they became worthless during the taxable *283 year 1970.
Decision will be entered under Rule 155. Footnotes
1. All statutory references hereafter refer to the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. Although the parties have stipulated to these sales and we find them accordingly, we wish to point out that the stock record of ATL (which shows purported transfers of common stock) has only one entry for John L. Williams and that represents a transfer to him of 100 shares on July 24, 1968. The stock record indicates the shares were acquired from Gerald F. Lackey, petitioners' son.
3. Although petitioner testified R. Gaither Critz was one of the original subscribers and, therefore, could purchase stock at $1 per share, the stock record of ATL indicates Mr. Critz purchased his shares from A. Laban Chapman and not from ATL.↩
4. We realize that the "sales" at $1 per share were made to original subscribers under a privilege granted to them. ↩
5. Moreover, there is no indication the buyer had reasonable knowledge of all relevant facts (such as the number of sales made at $1 per share).↩
6. One of the notes was made in the name of Parrish Dray Lines, Inc., and that note appears to be cosigned by Mr. Lackey in his individual capacity. Mrs. Lackey signed only two of the notes.Respondent does not contend that petitioners (or either of them) were not primarily liable for the principal and interest on all the notes, and, in fact, refers to the notes collectively as "petitioners' six notes."↩
7. See also Allied Tube & Conduit Corp. v. Commissioner,T.C. Memo. 1975-281↩.
8. Cf. Helvering v. Hammel,311 U.S. 504 (1941); Harris v. Commissioner,T.C. Memo. 1975-125↩.
9. See also Ference v. Commissioner,T.C. Memo. 1974-30↩.
10. The Granger case was not referred to in our opinion in Newhouse,↩ nor was it cited by the parties therein on brief.
11. This evidence was entered by respondent in an attempt to satisfy his burden of proof on issue 3, infra.↩
12. Although Mr. Lackey testified that his assets were greatly in excess of his liabilities on November 20, 1970, he did not offer to explain how, in less than one month, he became a bankrupt with liabilities almost five times greater than assets. We have given his testimony on this issue little weight.↩
13. SEC. 6672. FAILURE TO COLLECT AND PAY OVER TAX, OR ATTEMPT TO EVADE OR DEFEAT TAX. Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable.
14. The antiques were listed on the return as "Stock of Log Cabin Antique Shop" with a basis of $21,206.
15. No argument has been made that the proceeds of sale applied against the penalty under section 6672 are deductible. Cf. Smith v. Commissioner,34 T.C. 1100, 1107 (1960), affd. per curiam 294 F. 2d 957 (5th Cir. 1961); Hudlow v. Commissioner,T.C. Memo. 1971-218; Kolberg v. Commissioner,T.C. Memo. 1965-171↩.
16. On brief, respondent argues for the first time that petitioners' basis in the antiques was no greater than $6,000, rather than the $6,500 figure used prior to trial.↩
17. While respondent has argued that petitioners have not shown the total amount realized from the sale of the stock, we think this argument is a bit fallacious in light of the fact that respondent sold the property. We think the amount realized, although not in the record, is not really subject to dispute, and the parties are directed to compute the gain or loss on the sale of stock under Rule 155, Tax Court Rules of Practice and Procedure. Should a dispute arise concerning this issue, we will entertain an appropriate post trial motion to reconsider our opinion.
18. This latter argument only becomes relevant if we find that less than all of the expenses are deductible. The parties have agreed only to the total amount of travel expenses paid during the year and not to the amounts attributable to any single trip.↩
19. Petitioners feel these latter expenses are deductible under section 212↩.
20. Cf. Commissioner v. Stidger,386 U.S. 287 (1967), where the Supreme Court held that a Marine Corps officer's "home" for purposes of section 162(a)(2)↩ was his permanent duty station in the Far East rather than his family residence in California.
21. No contention has been made that petitioner's stay in Wilmington, N.C., was "temporary," rather than "indefinite" or "indeterminate." See Blatnick v. Commissioner,supra↩ at 1348.
22. See also Karp v. Commissioner,T.C. Memo. 1976-325↩.
23. Cohan v. Commissioner,39 F. 2d 540↩ (2d Cir. 1930). 24. Petitioner's contention that these trips (and those mentioned earlier) constitute local business travel not subject to section 274 is simply not supported by the evidence. Moreover, even if such a contention were proven, there is no way we can separate the transportation costs from meals and lodging on the record before us. Any "estimate" in that regard would simply be a guess↩ not based on any evidence presented. This we decline to do.
25. See also Frazier v. Commissioner,T.C. Memo. 1975-220↩.
26. Cf. Oster v. Commissioner,T.C. Memo. 1964-335↩.
27. Bramer v. United States,259 F. 2d 717, 721 (3d Cir. 1958); Bramer v. Commissioner,6 T.C. 1027 (1946), affd. 161 F. 2d 185 (3d Cir. 1947), certiorari denied 332 U.S. 771 (1947). See also Brenner v. Commissioner,62 T.C. 878, 883↩ (1974). 28. Granan v. Commissioner,55 T.C. 753 (1971); McAdams v. Commissioner,15 T.C. 231 (1950), affd. 198 F. 2d 54 (5th Cir. 1952); Keenan v. Commissioner,20 B.T.A. 498↩ (1930). 29. Of course a cancellation of the indebtedness by the creditor, in bankruptcy proceedings or otherwise, may have considerable tax consequences, but no cancellation of indebtedness issues have been raised in the present case.↩
30. The parties have stipulated to the January 28, 1969, date for both notes. However, the note to E. Gerald Lackey bears a date of February 1, 1969. No explanation of this discrepancy appears in the record.
31. The note is actually issued to "Jane L. Lackey," not Mary Jane Lackey. However, it appears from the record that Jane L. Lackey and Mary Jane Lackey are the same individual, and we so find.↩
32. See also, Underwood v. Commissioner,63 T.C. 468, 475 (1975), affd. 535 F. 2d 309↩ (5th Cir. 1976).
33. Obviously, we cannot assume that petitioner's basis in the note is the face value thereof simply because there was adequate consideration given for it. The note could have been issued in exchange for petitioner's services, which would give him (a cash basis taxpayer) a zero basis in the note, assuming no cash equivalence problems. See Shapiro v. Commissioner,T.C. Memo. 1961-118↩.